Kenneth A. INGBER, et al.,
Appellants-Cross Appellees,

v.

Stuart ROSS, Appellee-Cross Appellant.

Nos. 82–1329, 82–1345.

District of Columbia Court of Appeals.

Argued Dec. 2, 1983.

Decided June 20, 1984.

William J. Conti, Washington, D.C., with whom Judson A. Gould, Washington, D.C., was on briefs for Ingber.

William Caldwell, Washington, D.C., with whom Suzanne McQueen Caldwell, Washington, D.C., was on briefs for Ross.

Before FERREN and TERRY, Associate Judges, and KERN,* Associate Judge, Retired.

KERN, Associate Judge:

These are cross-appeals by the parties, Dr. Ross and Dr. Ingber and his professional corporation, from the trial court's judgment entered after an eight-day trial without a jury. In essence the judgment ordered (1) the rescission of certain agreements concerning the practice of dentistry into which the parties had entered for the reason that Dr. Ingber had committed a material breach, and (2) the payment by Dr. Ingber of some $70,000 to Dr. Ross for the consequent damages he suffered from various wrongful actions by Dr. Ingber and his corporation. Dr. Ross complains on appeal that the trial court erroneously failed to award all the damages he incurred as a result of such wrongful actions; Dr. Ingber, in response, urges that the trial court's award of damages was erroneous. We affirm the trial court in all respects.

Without describing all the efforts by the parties, both practicing dentists, to combine their practices and without detailing all the actions by the parties in the dispute that arose between them, we set forth the facts sufficiently to put in context the legal contentions they make on appeal.[1]

---

* Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

**1.** The parties have filed briefs and appendices in this court totalling well over 200 pages—in an apparent effort to apprise the court of *all* the facts of this hard-fought controversy.

Dr. Ingber commenced the practice of dentistry in 1971 and incorporated his practice in 1975 pursuant to the District of Columbia Professional Corporation statute. Dr. Ross, who commenced practicing dentistry in 1975, worked for at least a year in Dr. Ingber's office, conducting both his own practice as well as performing specified dental work for patients referred to him by Dr. Ingber.

In 1979 Dr. Ingber proposed that Dr. Ross buy into his dental practice, which Dr. Ingber valued at $200,000, and offered to sell him 50 per cent of his professional corporation's stock. The parties then agreed to value Dr. Ross' own practice at $20,000, which he would merge with Dr. Ingber's professional corporation. Consequently, they agreed to adjust the valuation of the stock of Dr. Ingber's professional corporation downward to $180,000 in recognition of the amount of Dr. Ross' contribution to their joint enterprise. In November 1979 the parties executed a stock purchase agreement and an employment agreement.[2]

Dr. Ross, in addition to contributing his own dental practice (valued at $20,000) to the corporation, paid Dr. Ingber about $26,000 in cash, thereby obtaining 14.5 per cent of the stock of the corporation. It was contemplated then that Dr. Ross would be enabled in due time to purchase the balance of the 50 per cent share of the stock to which he was entitled under the parties' agreement from the fees he would earn practicing dentistry with Dr. Ingber. Although the parties had agreed at the time of execution in November 1979 that Dr. Ingber was to transfer 14.5 per cent of the shares of stock to Dr. Ross in exchange for his cash payment, Dr. Ross did not receive any stock until after the parties commenced litigation in the trial court almost two years later.[3]

As it turned out, Dr. Ingber did not confer upon Dr. Ross what had been promised him: a "full-voice" in the management and conduct of the professional practice. Specifically, the trial court found that Dr. Ingber continued to control the distribution of patients and to decide the course of treatment of such patients;[4] and consequently, Dr. Ross' opportunity to obtain income from the professional services he rendered was lessened. In 1980, at the annual meeting of the corporation, Dr. Ingber announced that his salary would be increased and he continually insisted on the right, by himself, to decide the salaries of employees of the practicing corporation and also to make all other personnel decisions.

In August of 1980, the corporation purchased the practice of a retiring dentist, Dr. Schertz. The presence of Dr. Ross was a major factor in the decision by the retiring dentist to sell his practice to the corporation. Up to March 31, 1981, the practice of Dr. Schertz had produced for the corporation some $42,000 in fees and through April of 1982 it generated about $63,600 in fees.

Dr. Ross was by the terms of the employment agreement entitled to a share of the corporation's annual net profits based upon the average amount of stock he owned during the preceding year, but he never received any share of such profits. The trial court found the net profits were about $11,000 in 1980 and some $20,000 in 1981, so that based upon Dr. Ross' holding

---

2. Dr. Ingber on behalf of his professional corporation and himself agreed to sell and Dr. Ross agreed to purchase 50 percent of the stock of the corporation, conditioned upon performance of the terms of the employment agreement. The employment agreement established, among other things, the terms of Dr. Ross' employment, his compensation and fringe benefits, his role in management and provided for the distribution of profits and losses. (Plaintiff's Exhibit 2.)

3. Official corporate records and tax returns reflected that only 100 shares of stock had been issued and these were owned entirely by Dr. Ingber.

4. Dr. Ross was critical of certain practices by Dr. Ingber in the diagnosis and treatment of patients, finding them inappropriate and/or overly-expensive.

of 14.5 per cent of the corporation's stock he would have been entitled to some $1600 in 1980 and $2900 in 1981.

In December 1980, Dr. Ross advised Dr. Ingber that he was considering buying the balance of the 50 per cent of the shares of the corporation's stock which they had agreed he might purchase. Dr. Ingber wrote Dr. Ross that "your employment agreement and buy in agreement with this professional corporation have been 'frozen'." In January 1981, Dr. Ross informed Dr. Ingber that he was terminating his employment with the corporation in light of (1) Dr. Ingber's action of "freezing" the stock purchase agreement and (2) the various breaches by Dr. Ingber of the employment contract. The attorney for the corporation then wrote Dr. Ross that they deemed Dr. Ross' action of terminating employment with the Corporation to constitute a voluntary withdrawal from the corporation. In March 1981, Dr. Ross was locked out of the corporate offices and various pieces of equipment and some patient's records he had brought to the corporation were retained by Dr. Ingber. In April 1981, a special meeting of the corporation's stockholders was held and Dr. Ingber, the sole stockholder, voted to remove Dr. Ross as a director.

After Dr. Ross left the corporation's practice he received payment from patients he had previously treated on behalf of the corporation. Dr. Ross placed such payments in an escrow account, ultimately paying over to the corporation all but $1300 of this fund.

After Dr. Ross' departure, Dr. Ingber told a patient, Ms. McCullough, who had been prepared to have Dr. Ross perform her dental work, that Dr. Ross was not a good dentist, had worked for the corporation only as a hygienist, and did not handle complex cases. The office manager for the corporation made the same statement to this patient concerning Dr. Ross. Dr. Ingber also told another patient, Ms. Gardner, that she "would be sorry" if she continued Dr. Ross as her dentist and that Dr. Ross

had acted unprofessionally while practicing with Dr. Ingber. The patient McCullough subsequently repeated to the patient Gardner what Dr. Ingber and the office manager had told her about Dr. Ross' lack of professional ability and his being a hygienist rather than a dentist.

The parties then commenced litigation in the trial court. Dr. Ross by amended complaint brought action against Dr. Ingber and his professional corporation alleging that: they had breached the stock purchase and employment agreements and had received unjust enrichments; Dr. Ingber had individually slandered him; and, they had wrongfully converted to their own use his medical equipment and patient charts. Dr. Ingber and his corporation counterclaimed for damages they allegedly incurred as a result of Dr. Ross' allegedly unlawful departure from the corporation; his asserted slander of Dr. Ingber; and, Dr. Ross' solicitation of patients of the corporation and his retention of payments by such patients.

The trial court, after hearing testimony and argument by counsel, concluded that Dr. Ingber and his corporation materially breached their agreement with Dr. Ross to assure him "a full voice in the management and conduct of the Corporation's business" by refusing to share with him the management of the dental practice and by depriving Dr. Ross of his right under the Stock Purchase Agreement to buy the balance of the 50 per cent of the corporation's stock. Accordingly, the trial court ordered the agreements between the parties rescinded and Dr. Ingber to repay to Dr. Ross the $26,000 he had paid for the corporation's stock. Also, the court determined that the income accruing to Dr. Ingber from the purchase of the practice of Dr. Schertz, the retiring dentist, constituted unjust enrichment and awarded $15,000 in damages to Dr. Ross.

The court also awarded to Dr. Ross, 14.5 per cent of the corporation's profits in 1980 and 1981, respectively. However, the court refused to award punitive damages to Dr. Ross, expressly finding "there was not

malice enough" and that "[t]he cause of the problems was more due to the emotional temperament of the parties."

As to the alleged slander of Dr. Ross, the trial court refused to allow him to obtain damages from the corporation for this claim because "the Amended Complaint does not include this count and because the defendant corporation may not have had sufficient time to prepare for this claim." However, the court specifically concluded that Dr. Ingber's statements to the patient, Ms. McCullough, that "Dr. Ross only worked as a hygienist" and "could not handle complex cases" was slander per se and not privileged. The court awarded $25,000 in compensatory damages to Dr. Ross. As to the asserted slander of Dr. Ross by Dr. Ingber's comments to the patient, Ms. Gardner, that she "would be sorry" should she go to Dr. Ross, the court concluded that these statements "were not slander per se."

As to the counterclaims presented by Dr. Ingber and his corporation, the court declined to conclude that the statements by Dr. Ross had been slanderous. As to the claim that Dr. Ross breached the employment contract by soliciting the corporation's patients after he was locked out, the court denied such claim. Finally, the court declared as a setoff against the awards to Dr. Ross the amount of the balance of $1,300 in the escrow account set up by Dr. Ross to hold payments from the corporation's patients for whom he had done work after leaving the corporate practice.

In sum, the court's judgment awarded Dr. Ross some $70,000, together with his costs. Both parties now challenge this judgment on appeal. For the reasons set forth below we affirm the trial court's judgment.

█ We first take up Dr. Ingber's contentions concerning the court's conclusions that he breached the parties' agreements. The trial court found that Dr. Ingber materially breached Dr. Ross' employment contract by denying him a "full voice in management" which was required by the con-

tract. (Plaintiff's exhibit 2, paragraph 10.) Dr. Ingber argues that the trial court incorrectly interpreted that provision of the contract, and that there is insufficient evidence to support the court's conclusion that he breached the provision.

According to Dr. Ingber, the trial court interpreted "full voice in management" to mean that the parties intended to *share* management of the corporation. He argues that the provision in the contract only conferred upon Dr. Ross, as a minority shareholder, a right of consultation. (Brief for appellant Dr. Ingber at 23.) Dr. Ingber cites the *Webster's New Collegiate Dictionary* definition of "voice" as a "wish, choice or opinion openly or formally expressed, or a right of expression".

In addition, he relies on *Smith-Faris Company v. Jameson Memorial Hospital Association*, 313 Pa. 254, 169 A. 233 (1933), a case construing a contract to determine whether a contractor was either an independent contractor or an agent of the owner. The contract in *Smith-Faris* provided that "in placing orders for materials and awarding of sub-contracts, the wishes of the Owner is to be respected, and in the employment of mechanics or help, Owner is to have a voice." *Id.* at 261, 169 A. at 236. The court found that the owner's voice was "not necessarily the voice of *authority*. It is quite likely to be only the voice of advice or counsel." *Id.* The Pennsylvania court noted that there was nothing in the contract expressly placing in the owner any authority to hire and fire in accompanying his "voice" and determined that this provision was not inconsistent with a conclusion that the other party to the contract was an independent contractor rather than an agent. *Id.* at 262, 169 A. at 236.

In marked contrast to the language at issue in *Smith-Faris*, the language in Dr. Ross' employment contract provided that "the corporation shall provide procedures in its by-laws and/or otherwise which will assure the Employee with a full voice in the management and conduct of the Corpo-

ration's business." (Plaintiff's exhibit 2, paragraph 10.) The reference to the provision of "procedures" indicates that, in contrast to the contract in *Smith-Faris,* the intent of the parties here was that Dr. Ross' right to a "voice" was the right to have management authority. Moreover, Dr. Ross was not an independent contractor, but a part owner of the corporation with a contractual right to purchase half of the shares. The provision of assuring him "a full voice in the management" protected his investment in the Professional Corporation.

Thus, we agree with the trial court that the parties had agreed they would share management of the corporation. Sharing management by the contracting parties meant more than just the right of each to speak; it also meant the right of each to have impact on decisions for the corporation. The finding of fact by the trial judge that Dr. Ingber *unilaterally* made the decisions regarding the management of the corporation fully supports his conclusion that Dr. Ingber breached the "full voice" in management provision of the employment contract.

Dr. Ingber then argues that there is insufficient evidence to support the trial court's finding that Dr. Ross was denied a full voice in the management of the corporation. We do not agree. For example, Dr. Ingber's letter of December 3, 1980 (plaintiff's exhibit 6), both expressly and generally by its tone, indicates that it is Dr. Ingber who shall determine the policy of the corporation. In addition, in his letter to Dr. Ross on December 25, 1980 (Plaintiff's exhibit 7) he tells Dr. Ross that "as far as the new purchase price and interest rate for your buy in agreement, *I am keeping with my proposal of last month.*" (Emphasis added.) The letter indicates that Dr.

Ingber unilaterally "froze" the employment agreement as well as the buy in agreement and changed Dr. Ross' compensation formula. There is sufficient evidence, based on the testimony of the witnesses, that Dr. Ross had no say either in the setting of Dr. Ingber's salary and the salaries for non-shareholder employees of the practice, or in the hiring and firing of such employees; and, that Dr. Ingber treated the corporation as if it were his sole proprietorship, using corporate funds for a variety of personal expenditures. In our view, the evidence supports the trial court's finding that Dr. Ross was denied a full voice in the management of the corporation.[5]

■ Dr. Ingber also argues that the trial court erred in finding that he anticipatorily repudiated the Stock Purchase Agreement. He argues, based on *Order of AHEPA v. Travel Consultants, Inc.,* 367 A.2d 119 (D.C.1976), "that the repudiating party must have communicated, by word or conduct, unequivocally and positively its intention not to perform." *Id.* at 125. Dr. Ingber maintains that the record does not support such a finding.

In *Order of AHEPA,* this court found sufficient evidence of a repudiation when the president of AHEPA wrote a letter to Travel Consultants, Inc. (TCI) directing them "not to act on behalf of the Order of AHEPA until further notice", and then attempted to bargain for modifications to the contract. TCI refused to modify the contract and urged the AHEPA president to proceed under the original contract. *Id.* at 125.

The facts in the instant case are similar. The record reflects that on December 3, 1980, Dr. Ingber wrote Dr. Ross that he was freezing until January 1982 Dr. Ross' right to buy into the practice and that the

---

**5.** We do not agree with Dr. Ingber that the trial court's interpretation of "full voice" conferred by the parties agreement upon Dr. Ross "a right to make management decisions, especially regarding the assignment of patients, [and] violates the parol evidence rule." (Brief for Appellants Ingber, *et al.,* at 28.) The trial court did not base its determination of a violation of the contract on the fact Dr. Ross was not able to make decisions regarding patient distribution; rather, the court found that Dr. Ingber *unilaterally* made the decisions and thereby violated Dr. Ross' right to a "full voice".

price of the practice would be adjusted upward. Dr. Ross then informed Dr. Ingber that he was considering the exercise of his right under the contract to purchase the balance of the stock and thereby become a 50 per cent owner of the corporation. Nevertheless, Dr. Ingber responded by letter on December 25, 1980, that Dr. Ross' employment contract and buy in agreement with the corporation had been "frozen" and that the purchase price and interest rate would be increased. The evidence indicates that Dr. Ross never agreed to these attempts by Dr. Ingber to modify the contract. Furthermore, the record supports the trial court's finding that Dr. Ingber did not retract his freezing of the Stock Purchase Agreement. Based on the *Order of AHEPA v. Travel Consultants, Inc., supra,* there is sufficient evidence to support the trial court's finding that Dr. Ingber anticipatorily repudiated the contract.

We now address Dr. Ingber's contentions challenging the trial court's findings that he had obtained unjust enrichment. Based on the court's determination that Dr. Ingber materially breached the employment contract and repudiated the Stock Purchase Agreement, the court rescinded these agreements and awarded Dr. Ross the amount he had paid for his stock, $26,400. In addition, the court determined that Dr. Ingber was unjustly enriched by (1) taking advantage of Dr. Ross's efforts in enabling the corporation to purchase the Schertz practice and (2) by keeping Dr. Ross' share of the corporate profits. The court awarded $15,000 and $2,900 respectively for these claims of unjust enrichment.

■ Dr. Ingber argues that the "court's award is erroneous because it amounts to a judgment for *both* rescission and damages on the contract—an impermissible double recovery. We would agree that an action for restitution is an alternative remedy to an action for damages when there has been a repudiation or material breach of the contract. 12 *Williston on Contracts,* § 1454 at 14 (1970). However, the judge in the instant case granted rescission and invoked the equitable remedy of restitution for unjust enrichment, which remedies are not necessarily inconsistent or mutually exclusive. *See* RESTATEMENT (SECOND) RESTITUTION § 15 (Tent. Draft No. 1 1983).[6] Although the remedies should not be cumulative so as to provide a double recovery, *id.* at § 18, comment a, we do not find under the circumstances here such an improper recovery.

■ We agree with the trial court that, upon the evidence in the instant case, both rescission and restitution for unjust enrichment are appropriate. Rescinding the contract and returning to Dr. Ross what he paid for his stock without compensating him for his efforts in expanding the practice would result in the unjust enrichment of Dr. Ingber. Moreover, there were findings by the trial judge that Dr. Ross was instrumental in convincing Dr. Schertz to sell his practice to the corporation upon his retirement, and yet Dr. Ingber kept virtually all of these patients as his own. In addition, there were further findings of fact, supported by the evidence, that Dr. Ingber did not share any of the corporation's profits with Dr. Ross during the time they worked together. Under these cir-

6. The RESTATEMENT (SECOND) OF RESTITUTION § 15 (Tent. Draft No. 1 (1983) provides:

Consistency of Remedies

A person may, without inconsistency, claim both restitution from another and damages or other relief against him although the several claims arise from a single transaction or set of circumstances. Mutually exclusive remedies are not awarded, however. Two remedies are mutually exclusive if a finding essential to the award of one is inconsistent with a finding essential to the award of the other.

Illustrations:
 1. A sells a pasture to B, being induced to do so by B's fraud. On learning of the fraud, A sues B in two counts. First, he asks that the sale be avoided and (upon restoration to B of the price) that A's deed to B be cancelled. Second, A asks for judgment against B for the reasonable rental value of the property while B had title. A can have relief on both counts; they are not mutually exclusive....

cumstances rescission alone is not adequate.[7]

We take up now the challenge by Dr. Ingber to the award of damages against him for slander. The trial court found that statements made by Dr. Ingber to a patient, Ms. McCullough, that "Dr. Ross only worked as a hygienist" and "could not handle complex cases" were slander per se and were not privileged. The court awarded $25,000 in damages to Dr. Ross.

We agree with Dr. Ingber that the record does not support the court's finding that he had said Dr. Ross *could* not perform complex work; rather the evidence is that Dr. Ingber said that Dr. Ross *did* not perform complex work. Nevertheless, when this statement is coupled with the statement by Dr. Ingber that Dr. Ross only worked as a hygienist, the meaning conveyed to the listener was that Dr. Ross was *not* capable of doing complex work because he was *not* a dentist.

■ The trial court determined these statements to be slander per se and not privileged. While we agree with the trial court's ultimate determination, the court's terminology was imprecise. Clearly, the statements by Dr. Ingber to a patient enjoyed a qualified privilege because Dr. Ingber would be privileged in warning such patient about an incompetent colleague.[8] The defense of a qualified privilege, however, is lost by a showing of malice.[9] Under the circumstances, where Dr. Ross was a practicing dentist and practicing with Dr. Ingber, Dr. Ingber obviously was wrong when he called Dr. Ross a hygienist. This constitutes malice on Dr. Ingber's part and so defeats his qualified privilege, and is also malice under the Supreme Court's definition of *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964) ("knowledge that it was false or with reckless disregard of whether it was false or not.") Thus, the precise analysis is that the statement by Dr. Ingber to the patient, Ms. McCullough, was slander per se, enjoyed a qualified privilege, but the privilege was defeated by the showing of malice on the part of Dr. Ingber, *viz.*, a knowing and hence deliberate misstatement of fact.[10]

■ Dr. Ingber argues that the court's award of $25,000 to Dr. Ross was impermissible. He reasons that the only colorable claim of damages proven by Dr. Ross was that Ms. McCullough declined to have

---

7. Appellant's argument that the evidence does not support the "contract award of damages" to the extent of Dr. Ross' 14.5 percent interest in the corporation is without merit. The court's award is not based on the contract, but on the principles of unjust enrichment; and "[w]hile an award may not be based on speculation or guesswork, it may be a just and reasonable estimate based on relevant data." *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 550 (D.C. 1981).

8. A qualified privilege exists for communications made in good faith upon a subject matter "in which the party communicating has an interest or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty ..." *Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C. 1979) quoting *May Department Stores Company v. Devercelli*, 314 A.2d 767, 773 (D.C.1973).

9. In the context of a qualified privilege, the definitions of malice "in substance come down to the equivalent of bad faith." *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C.1983). "Put another way, a qualified privilege exists only if the publisher believes with, reasonable grounds, that his statement is true." *Id.* (citations omitted).

10. Dr. Ingber argues that the trial court did not find actual malice as defined· by *New York Times v. Sullivan, supra*. While we agree that the trial judge could have been more precise, we believe that when he found the comments to be not privileged, the court thereby found that Dr. Ingber's privilege was defeated by malice. Certainly, Dr. Ingber knew that the minority shareholder in his corporation was a dentist, not a hygienist, and it is inescapable that the comment was made with knowledge of its falseness. Were we to hold that the trial judge did not find actual malice, we would have to ignore the evidence of record and the trial judge's obvious intentions in finding the slander to be not privileged. *Cf. Bose Corp. v. Consumers Union of United States*, —— U.S. ——, ——, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984). ("The *New York Times* rule emphasizes the need for an appellate court to make an independent examination of the entire record ....")

Dr. Ross do $10,000 worth of dental work.[11] Dr. Ingber then asserts that the remaining $15,000 of damages awarded reflects an award for presumptive damages which, based on *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), are unconstitutional. However, *Gertz* expressly excludes from its coverage cases such as this one in which *New York Times* actual malice is proven. *Id.* at 349–50, 94 S.Ct. at 3011–12. Thus, we need not decide whether the award of $25,000 was limited to compensation for actual injury or also included presumed damages. Moreover, while we have analyzed the instant case and determined that it does not violate the restraints on damages imposed by *Gertz*, we are not required here to confront and decide whether as a general policy we should apply the *Gertz* rationale to cases such as this involving non-media defendants.

Next, Dr. Ingber argues that the court's verdict of $25,000 for slander of Dr. Ross is excessive as a matter of law. We note that the fact finder has substantial latitude in awarding compensatory damages for slander. "It may take into account the seriousness of the defamatory charge, the extent of distribution of the defamation, the extent to which the communication was actually believed, and plaintiff's prominence and professional standing in the community." R. Sack, LIBEL, SLANDER, AND RELATED PROBLEMS 354–5 (1980). According to Mr. Sack, the classic statement on excessive damages for slander was formulated by Chancellor Kent:

> The damages ... must be so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by

passion, partiality, prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant, or the court cannot undertake to draw the line; for they have no standard by which to ascertain the excess.

*Id.* at 357, quoting *Coleman v. Southwick*, 9 Johns. 45 (1812). In light of the seriousness of the defamation and the evidence that the slander was repeated (Supp. Record at 708), we do not find the court's verdict to be excessive.

Finally, Dr. Ingber argues that the trial court abused its discretion in awarding costs to Dr. Ross under Super.Ct.Civ.R. 54(d).[12] Specifically, Dr. Ingber maintains that it was improper for the court to award the cost of air fare and per diem for two witnesses who testified for Dr. Ross voluntarily rather then pursuant to subpoena; and, that it was also improper for the court to award costs for certain depositions that Dr. Ross did not introduce at trial and did not demonstrate on the record to be necessary for the preparation of his case.

■ The award of costs is within the trial court's discretion and may only be overturned upon our finding that the exercise of such discretion was an abuse. *Panos v. Nefflen*, 205 A.2d 600, 602 (D.C. 1964). We do not agree that the trial judge abused his discretion by awarding costs for witnesses who appeared voluntarily rather than by subpoena. It is not necessary that a witness testify under subpoena to be taxed as a cost; rather, the trial judge should look to whether the testimony of the witness was relevant and material to an issue in the case and appeared reasonably necessary to its disposition. *See Spiritwood Grain Co. v. Northern Pacific Ry.*,

---

11. Dr. Ingber argues that Dr. Ross did not prove *any* actual damages. Based on the testimony of Ms. McCullough, *viz.*, that she declined to have Dr. Ross do $10,000 worth of dental work because of the slander, this argument is without merit.

12. Super.Ct.Civ.R. 54(d) provides in relevant part as follows:

> Except when express provision therefor is made either in an applicable statute or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs ....

179 F.2d 338, 344 (8th Cir.1950); 6 J. MOORE, W. TAGGART & J. WICKER, MOORE FEDERAL PRACTICE § 54.77[5–1] (2d ed. 1983).[13] Based upon our review of the transcript, the two witnesses' testimony was clearly relevant and material. Indeed, Dr. Ingber has not argued otherwise.

As to Dr. Ingber's argument that Dr. Ross failed to demonstrate that certain depositions he had taken were necessary for the preparation of his case, the court held a hearing on the bill of cost submitted by Dr. Ross and specifically considered the necessity of the depositions for the preparation of his case. Dr. Ross explained the need for each deposition (Supp. Record # 3 at 16–19). We cannot conclude in the face of such evidence that the trial judge abused his discretion in awarding the costs of such depositions.

We now address the contentions by Dr. Ross that the trial court's award of damages was insufficient. Dr. Ross argues first that the trial court should also have granted him as restitution the value of his own dental practice which he had contributed to the corporation when the parties entered into their agreements. Dr. Ross sought to recover $20,000 for his contribution which consisted of dental equipment and supplies, patient charts, x-rays, study models and other records, prepaid professional liability insurance, accounts receivables and goodwill. (Record at 576–77.) Significantly, though, upon leaving the corporation, Dr. Ross was able to solicit patients of the corporation, and the patients were free to follow him in his new practice if they so chose. Based on this fact, the trial judge determined that a monetary award for the value of the practice contributed by Dr. Ross was not appropriate to effect rescission. (Record at 592.) We agree.

The evidence is that the corporation returned to Dr. Ross all his patients' charts, except in one limited instance where the corporation claimed a right to his chart for non-payment of a bill. (Supp. Record at 209.) The equipment consisted of an autoclave, nitrous oxide machine, bench engine and hand instruments. Dr. Ross testified that he purchased the nitrous oxide machine in 1978 for $453. (Supp. Record at 211–2.) The other equipment was purchased generally in the early 1970's, each for about $200. (Supp. Record at 210–14.) The evidence is not clear that the equipment still has any value, and we note that Dr. Ross is not requesting restitution of the equipment *in specie*. With regard to the accounts receivable, we do not believe Dr. Ross is entitled to restitution because, as he testified, he received a salary from the corporation calculated on the monies collected from the work he performed. (Supp. Record at 62.) Thus, we agree with the trial court that the value of Dr. Ross' practice is in his good will and other intangibles which he was able to take with him when he left the corporation.

Dr. Ross next contends that the trial court erred in rejecting his claim for slander against the Corporation because its employees had also slandered him. The ruling by the trial court was that the Amended Complaint did not include this count, and we deem this ruling correct as the slander count only speaks to Dr. Ingber's statement about Dr. Ross. (Record at 511.) The trial judge also based his ruling on the fact that the defendant corporation may not have had sufficient time to prepare for this claim. Nevertheless, Dr. Ross vigorously contends that this claim was actually tried by the court. The record reflects that Mikki Ashin, the office manager and a corporate employee, repeated to a patient, Ms. McCullough, the same slanderous statement about Dr. Ross which Dr. Ingber had

**13.** Super.Ct.Civ.R. 54(d) is substantially identical to Fed.R.Civ.P. 54. Thus we consider federal decisional authority to be persuasive.

made to Ms. McCullough.[14] The issue is (1) whether the slander was tried by implied consent of the parties during the trial so that the trial court erred in refusing to allow an amendment to the pleadings, and (2) if the court did err in this respect, whether Dr. Ross could recover twice where two different individuals, Dr. Ingber and Ms. Ashin, make the same statements to the same audience, Ms. McCullough, the patient.

Super.Ct.Civ.R. 15(b)[15] is designed to favor substance over form "and thus promote the resolution of cases on their merits by permitting the amendment of pleadings to reflect the actual litigation that transpired." *Moore v. Moore*, 391 A.2d 762, 768 (D.C.1978). Judges are empowered to amend pleadings after trial to add claims or defenses that were either expressly or impliedly tried by consent of the parties. *Id.*

Here, whether the parties have impliedly contested the matter—Dr. Ross' claim of slander by the corporation acting through its agent Ms. Ashin—"is determined by searching the trial record for indications that the party contesting the amendment received actual notice of the injection of the unpleaded matters, as well as an adequate opportunity to litigate such matters and to cure any surprise from their introduction.... The clearest indications of a party's implied consent to try an issue lie in the failure to object to evidence, or in the introduction of evidence which is clearly apposite to the new issue but not to other matters specified in the pleading." *Id.* (citations omitted.)

The record shows that Dr. Ingber did not introduce any evidence concerning the slan-

der by the corporation acting through Ms. Ashin. Also, he did not cross examine the witness, Ms. McCullough, in reference to this slander, while, in contrast, he did cross examine her regarding the slander by Dr. Ingber. Dr. Ross argues, however, that the failure by Dr. Ingber to object at trial to Dr. Ross' questioning of Ms. McCullough concerning the slander by Ms. Ashin constituted, at least by implication, his consent to the trial of this particular claim.

Dr. Ingber responds that this evidence was relevant to matters already pleaded in that it showed an increased probability that Dr. Ingber had made his statement to the patient and hence Dr. Ingber would have had no basis to object. We cannot conclude under these circumstances that this evidence, unobjected to, was so uniquely pertinent to Dr. Ross' claim of slander by the corporation that Dr. Ingber, by failing to object, was implicitly agreeing to a trial of the claim by Dr. Ross against the corporation. *See id.* at 770.

■ In our view, Dr. Ingber was first put on notice that the issue of slander by the corporation was in fact being tried by the closing argument of Dr. Ross' attorney. Although Dr. Ingber's counsel did not object immediately he did object to the timeliness of this claim in his post-trial brief submitted to the court. The trial judge indicated that he would consider this brief as part of Dr. Ingber's argument. (Supp. Record at 1424.) Thus, the court was aware of Dr. Ingber's objection to the last-minute introduction into the trial of the slander claim against the corporation. We

---

**14.** The slanderous statement was that Dr. Ross was a hygienist, not a dentist, and did not do complex work.

**15.** Super.Ct.Civ.R. 15(b) provides in relevant part as follows:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the

evidence and to raise these issues may be made upon motion of any party at any time, even after judgment .... [T]he court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action of defense upon the merits.

cannot say that the judge abused his discretion in concluding under these circumstances that permitting Dr. Ross to amend his pleadings, after the trial, to include his slander claim against the corporation would have deprived the corporation of its "day in court." [16]

As to Dr. Ross' challenge to the trial court's ruling on his claim of a second slander by Dr. Ingber to another patient, Ms. Gardner, the record reflects that Linda Gardner testified that Dr. Ingber told her she "would be sorry" if she kept Dr. Ross as her dentist. (Record at 590, Supp. Record at 685.) She also testified that Dr. Ingber said that "Dr. Ross had been totally inethical (*sic*) and unprofessional in what he had done. That he had been really taken by Dr. Ross and if he had known that Dr. Ross was like that, he would have never hired him." (Supp. Record at 685.) [17]

The trial court found that these statements by Dr. Ingber to Ms. Gardner were not slander per se. (Record at 594.) While we agree with the trial judge's ultimate determination, his terminology was imprecise. The statements to Ms. Gardner by Dr. Ingber about Dr. Ross are clearly slander per se. The trial court found that Dr. Ingber's statements imputed to Dr. Ross "a lack of knowledge and skill in dentistry and a lack of honesty, character and integrity which tended to injure Dr. Ross' reputation in the community and were calculated to cause harm to Dr. Ross' reputation."

(Record at 589–90.) Given this finding of fact and the evidence of record to support such finding, the slander clearly tended to injure Dr. Ross in his profession and thus constituted slander per se. RESTATEMENT (SECOND) TORTS § 573 (1976).

Thus, the conscientious trial judge erred in stating Dr. Ingber's comment to Ms. Gardner was not slander per se. However, we understand the judge to have meant that the statement did not amount to *actionable* slander because it was privileged. [18] Thus, the issue is whether the court was correct in finding the statements by Dr. Ingber that Ms. Gardner "would be sorry" if she permitted Dr. Ross to treat her and that Dr. Ross had been unethical and unprofessional were not actionable slander.

 As we have stated above, a qualified privilege exists for communications made upon a subject matter "in which the party communicating had an interest or in reference to which he had or honestly believes he has, a duty to a person having a corresponding interest ...," *Smith v. District of Columbia, supra,* 399 A.2d 213, quoting *May Department Stores Company v. Devercelli, supra,* 314 A.2d 767. The defense of a qualified privilege is lost if the plaintiff shows malice. *Altimont v. Chatelain,* 374 A.2d 284, 290 (D.C.1977). Malice in the context of a qualified privilege is the equivalent of bad faith. *Id.; Ford Motor*

---

**16.** Thus, we need not and do not decide whether Dr. Ross may recover twice for the same slander spoken by two people to one individual.

**17.** The trial court also made an evidentiary finding that Dr. Ingber told Ms. Gardner that Dr. Ross "had stolen his patients thereby impugning Dr. Ross' honesty." (Record at 590.) We agree with Dr. Ingber that this specific finding is not supported by evidence in the record.

**18.** We note from the record that this was the issue posed before the court. In Dr. Ingber's argument at the close of trial and in his post-trial brief, he argued to the trial judge that the statements were not actionable slander because they were privileged. "Ingber also had a duty to

warn each of them if he believed Ross was not the proper dentist to render their dental treatment or was not conducting himself in an ethical or forthright manner. These are matters of great interest to a person seeking dental treatment and were properly communicated by Dr. Ingber." (Record at 490–1, *see* Supp. Record at 1364.) Dr. Ross argued in his rebuttal and in his post-trial brief that the statements were not protected by a privilege. He maintained that the privilege did not exist because Dr. Ingber did not prove that he believed the statements to be true and had reasonable grounds for his belief. (Record at 439, Supp. Record at 1410–2).

*Credit Company v. Holland,* 367 A.2d 1311, 1314 (D.C.1977). "Put another way, a qualified privilege exists only if the publisher believes with reasonable grounds that his statement is true." *Altimont v. Chatelain, supra,* 374 A.2d at 290. Moreover, the mere existence of ill will on the part of the publisher toward the subject of the publication does not defeat the publisher's privilege so long as the primary purpose is to further the interest which is entitled to protection. *Mosrie v. Trussell, supra,* 467 A.2d at 477.

■ The evidence supports the trial court's implicit finding here that the statements were not actionable because Dr. Ingber honestly believed that he had a duty to tell a patient, Ms. Gardner that, because of the complexities of her case, it would be in her best interest if she continued as his patient rather than go with Dr. Ross (Supp. Record at 1098–99.) Based on Dr. Ingber's testimony as to the circumstances surrounding Dr. Ross' departure, the trial court could have inferred that Dr. Ingber reasonably believed his statements were necessary to protect the welfare of the patient. Moreover, the court had found that Dr. Ross had solicited the corporation's patients after leaving the practice (Record at 592), and there was reason for Dr. Ingber to believe this action by Dr. Ross to be a violation of their contract. (Supp. Record at 1082.) Thus, the statement by Dr. Ingber to the patient, Ms. Gardner, that Dr. Ross was "[u]nethical and unprofessional" rested upon a duty to warn patients against an unethical colleague. The evidence supports a proper purpose and the furthering of an interest which is entitled to protection, *viz.,* the patient's welfare, by a qualified privilege. Since Dr. Ross did not meet his burden of establishing malice to defeat Dr. Ingber's privilege, we agree with the trial court's ultimate conclusion that Dr. Ross could not recover. However, the proper analysis was that the statements constituted slander per se, but such statements enjoyed a qualified privilege which Dr. Ross did not overcome.

Dr. Ross next argues that he should have been awarded additional damages against Dr. Ingber because the patient Ms. McCullough repeated to the other patient, Ms. Gardner, the slanderous statement made to her by Dr. Ingber—that Dr. Ross worked as a hygienist and did not handle complex cases. Dr. Ross did not pursue a claim against Ms. McCullough by an action against her for her "publication"; rather, he seeks by this action to hold Dr. Ingber responsible for *both* his publication *and* Ms. McCullough's subsequent publication.

■ We note that "each publication of a defamatory statement, including each republication, is a separate tort; each republisher is responsible for the effects of his republication." R. Sack, LIBEL, SLANDER AND RELATED PROBLEMS, *supra,* at 86. In some circumstances, the publisher may be responsible for both the publication and republication by another as well. THE RESTATEMENT (SECOND) TORTS § 576 provides that "[t]he publication of a libel or slander is a legal cause of any *special* harm resulting from its repetition by a third person if, but only if, ... (c) the repetition was reasonably to be expected." (Emphasis added.) While the court did find that the repetition was a reasonable and foreseeable consequence of Dr. Ingber's slander (Record at 590), the court did not find any special harm resulting from the repetition by Ms. McCullough of Dr. Ingber's slanderous statement.

Special harm within the meaning of the Restatement may result in one of two ways. First, there is the harm from a general rumor with repercussive effects on the plaintiff's reputation, such as the general loss of customers. Second, the harm may be traced to the reaction of a particular individual to whom the defamation was repeated. *Id.,* comment c. Dr. Ross did not present any evidence as to any special

harm. We agree with the trial court that under these circumstances he may not recover against Dr. Inber for Ms. McCullough's repetition.

 Dr. Ross next challenges the trial court's award of the $1,300 balance in the escrow account to Dr. Ingber as a setoff to the damages it had awarded against Dr. Ingber. The court found that Dr. Ross had not met his burden of proof that he had a right to the balance in the escrow account. Dr. Ross contends that because Dr. Ingber claimed the balance in the account, he, rather than Dr. Ross, had the burden of proof and failed to meet it. We deem Dr. Ross' argument to be without merit. The evidence in the record establishes that the funds in escrow belonged to the corporation. (Supp. Record at 920–24.) Thus, the trial court correctly concluded that Dr. Ross had the burden of proof on this issue and had established no right to the $1300.

 Dr. Ross finally argues that the court erred in denying attorney's fees as punitive damages for the malicious conduct of Dr. Ingber. In a case tried before a court sitting without a jury, the decision whether to award punitive damages is within the court's sound discretion. *United ed Securities Corp. v. Franklin*, 180 A.2d 505, 511 (D.C.1962); *Mariner Water, etc. v. Aqua Purification, etc.*, 214 U.S.App.D.C. 248, 253, 665 F.2d 1066, 1071 (1981). Our review of the record persuades us that the trial court did not err: this was a fiercely-contested litigation based upon a conflict of personalities in which the parties held very strong views of the righteousness of their actions.[19] Bitterness abounds in the record but the kind of malice on the part of one party that requires him to pay attorneys' fees of the other party is not present.

*Affirmed.*

**19.** The legal disputes in this case would appear to be very susceptible to compromise and settlement through this court's civil appeals settle-

ment machinery. Settlement, however, was not forthcoming.