Orby Z. MOSS, Jr., Appellant,

v.

Bessie A. STOCKARD, Appellee.

DISTRICT OF COLUMBIA, et al., Appellants,

v.

Bessie A. STOCKARD, Appellee.

Bessie A. STOCKARD, Appellant,

v.

Orby Z. MOSS, Jr., et al., Appellees.

Nos. 88–358 to 88–360.

District of Columbia Court of Appeals.

Argued Jan. 22, 1990.
Decided Sept. 25, 1990.

Donna M. Murasky, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellant in No. 88–358 and appellants in No. 88–359, and for appellees in No. 88–360.

John E. Scheuermann, Washington, D.C., entered an appearance on behalf of appellant Moss, and adopted the briefs of appellants in Nos. 88–358 and 88–359 and appellees in No. 88–360.

John M. Clifford, with whom John M. Delaney, Washington, D.C., was on the brief, for appellee in Nos. 88–358 and 88–359 and appellant in No. 88–360.

Before BELSON, STEADMAN, and FARRELL, Associate Judges.

FARRELL, Associate Judge:

This is a consolidated appeal arising from a jury verdict in favor of Bessie A. Stockard on claims of slander and breach of contract against defendants Orby Z. Moss, Jr., the Athletic Director of the University of the District of Columbia, the Board of Trustees of the University of the District of Columbia (UDC), and the District of Columbia (the District). Moss, UDC, and the District appeal from the trial judge's refusal to grant in their entirety their motions for a directed verdict on the slander and breach of contract causes of action. With respect to the slander claim, they argue that Stockard failed to establish the falsity of Moss's statements to others that Stockard's contract as head coach of the UDC women's basketball team had not been renewed because of "misappropriation" of funds entrusted to her. They also contend that Moss, as a public official, enjoyed an absolute privilege to make those statements or, in the alternative, had a qualified privilege which Stockard failed to defeat with the requisite showing that Moss made the statements maliciously. They further assert that Stockard, as a public official or public figure, was required to—but did not—demonstrate by clear and convincing evidence that Moss had made the statements with "actual malice" within the meaning of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Regarding the breach of contract claim, they assert that no coaching contract between UDC and Stockard existed for the 1981–82 basketball season, and that even if Moss's promise to renew the previous year's contract was enforceable, his decision not to do so was within his discretion in light of Stockard's behavior.

On her cross-appeal, Stockard challenges the trial judge's remittitur of the jury's verdict on the slander claim from $300,000 to $100,000, contending the judge invaded the jury's province by disturbing its findings on matters committed to jury discretion.

We conclude that whether Moss's statements were subject to absolute immunity turns upon whether his conduct was a "discretionary" function as defined in our decision in *District of Columbia v. Thompson*, 570 A.2d 277 (D.C.1990). Because the present record precludes an informed analysis of the policy factors necessary to resolve that question (*Thompson* having been decided after the trial in this case), we remand the case to the trial judge for consideration of the issue in light of *Thompson* and this opinion. To avoid duplicative appellate litigation in the event the trial judge concludes absolute immunity does

not attach, we reach the remaining issues as well and dispose of them as set forth below.

## I.

### A. *Factual Background*

In 1978, Bessie Stockard was a tenured Associate Professor in the Physical Education Department of UDC. Previously, she had acquired considerable experience as a women's basketball coach, having organized the women's basketball team at Federal City College, the predecessor of UDC, and served as coach for the United States World and American University women's basketball teams. In April 1979 Moss, Director of Athletics, offered to appoint Stockard head coach of the new women's basketball team at UDC, and Stockard accepted. The contract term was for one year [1] beginning June 1, 1979, renewable at Moss's discretion. Since Stockard believed, and Moss agreed, that it was impossible to develop a competitive basketball program in one year, they discussed a four or five year time frame. Accordingly, Moss's offer letter noted, "Beginning with the 1980–81 season, the position will hopefully come out of the appropriate budget," and he agreed to work "to set up special contracts for multi-year appointments" to ensure continuity in the program.

In 1980, acknowledging the success of Stockard's coaching and the team,[2] Moss offered to renew Stockard's contract. In deference to her desire to resume her former status as a full-time tenured professor of physical education, Moss offered the coaching position on a part-time basis with compensation at $9,000 for the coming year. In the renewal offer letter dated April 28, 1980, Moss sought to allay Stockard's concern over the brevity of the appointment, assuring her that "if you continue to meet the goals we jointly decide on each year, barring unforeseen circumstances or circumstances not under our control, you will be rehired." Stockard accepted the offer. Following the 1980–81 season, Moss again wrote Stockard a letter reviewing the progress she and the team had made, and continuing:

At the end of the 1982–83 season, I feel that we should, you, Ms. [Emma] Best [Assistant Director of Athletics for Women's Sports] and I will be able to establish whether the program is progressing the way it should and if these goals are being met. This time frame will have then given you four (4) years to develop your program, along your philosophy tempered by my direction, and Ms. Best's administrative support.

In conclusion, I feel that you are on your way, maybe even ahead of schedule in the area of winning and losing, to establishing a good program. You have until 1983 to put all the pieces into place, academically as well as athletically.

At trial, Moss testified that when he wrote this letter he had already received authorization to renew Stockard's contract and intended to rehire her for the 1981–82 season.

Nevertheless, on March 25, 1981, Moss orally informed Stockard that her contract would not be renewed. The termination resulted from Moss's dissatisfaction with her handling of and accounting for university funds disbursed to cover meal and other expenses during a three-day team trip to Atlanta for two "away" games in December 1980.

Stockard had obtained a cash advance of $1,150.00 for the trip from Curtis Watkins, the Athletic Department Business Manager.[3] At the end of the season, she sub-

---

**1.** Due to budgetary constraints affecting university athletic programs, internal university rules prohibited multi-year appointments for coaches.

**2.** The UDC Lady Firebirds enjoyed a 21–5 season in 1979–80, and received substantial radio, television and print media coverage of game results and individual team members' achievements.

**3.** Both Stockard and Watkins had signed a promissory note for the funds, acknowledging that the advance was to be used only for Athletic Department expenses, that the person receiving the funds would account at all times for the balance either by cash or receipts or both, that the recipient fully understood she was personally responsible for the custody and accountability of the advance, and that she would submit all

mitted a report to Watkins with receipts indicating that of the $1,150 received for the Atlanta trip, she had paid $145.65 for a team dinner on December 19, which Moss attended; $39.00 for a breakfast for twelve people on December 20; and $800 consisting of $40.00 in cash she had distributed to each of the twenty players as meal money for breakfast, lunch, dinner and a snack for each of the three days they were away. She submitted a "meal money signature sheet" bearing the signatures of each player who received the $40.00.[4] She had also paid $252 for an airline ticket for a player who decided to attend the trip at the last minute,[5] and had paid for incidentals such as oranges, ice and taxi fares.

Stockard testified that in mid-March, after Watkins had submitted the receipts and trip report to Moss, Moss called her in for a meeting and asked her if she had any more receipts. When she replied that she did not, Moss stated, "Curtis says those are not all the receipts," and asked her to take them back, look them over, and "fix" them. She insisted that the receipts submitted were all there were, and left them with Moss. Moss testified that after reviewing the receipts, he and Best spoke with several persons who had attended the Atlanta trip. Questions arose when Best informed

him that one player told her she had only received $21.00 in meal money. Moss also testified Stockard had submitted a receipt from Paschal's Motor Hotel in Atlanta indicating that a credit balance of $53.34 had been reduced to zero by a payment in cash, when in fact lodging for the team at Paschal's had been prepaid by the university.

Moss directed Stockard to meet with Best to straighten out the receipts, including the meal money and motel bill. Stockard resubmitted her report which was still unsatisfactory to Moss; he testified that the $40 meal money distributions to the players exceeded Departmental guidelines and violated AIAW rules limiting meal money distributions to participating team members.[6] When Moss and Best met with Stockard again, she told them that she "stood by" the receipts. On March 25, 1981, Moss again met with Stockard and told her she was either misrepresenting her trip reports or giving her players too much money. When Stockard refused to change her position, Moss told her that her contract would not be renewed.

The next day, Stockard wrote to Moss stating:

> Based on our two conversations, the first with you, Mrs. Best, and myself; and the

receipts and any unused portion of the advance to the cashier's office.

4. At some point, a mysterious second meal money signature sheet appeared. This one bore the "signatures" of some players who had not attended the trip, and had no amount in the blank where the players acknowledged receipt of meal money. Although a signature purporting to be Stockard's appears on the sheet, she testified that the signature was not hers, and that she had never signed a sheet with a blank amount. Stockard testified that the first time she saw the second sheet was at the third meeting in Moss's office regarding expenses of the Atlanta trip. When Moss produced the sheet, she told him she had not signed it, after which Moss informed her "that Curtis told him [you] gave him the meal slip." A note attached to the slip indicated Watkins had informed Moss that Stockard told him (Watkins) that the sheet could be used to justify the expenditures claimed for the Atlanta trip. The players who testified confirmed that they had never signed a meal sheet with the amount blank, and some testified that their signatures were forgeries.

5. Stockard testified that after one of the players had decided not to attend "for personal reasons," Moss decided he would use her ticket to go on the trip. At the last moment, the player changed her mind, necessitating purchase of another ticket for her.

6. At the time pertinent to the dispute, the Association for Intercollegiate Athletics for Women (AIAW) established limits for meal allowances for road trips amounting to a maximum of $17.75 per day per player. According to Moss and Best, an institution's failure to observe the limits could result in disqualification and cancellation of AIAW membership. Stockard's contract required her to adhere to all AIAW policies. In August 1980, due to financial constraints, UDC's Athletic Department instituted a policy calling for meal allowances in the maximum amount of $13.25 per player per day. While Stockard testified that she was aware of no departmental meal money limitation policy, Moss and Best testified that the policy was articulated in a memorandum circulated throughout the Department and discussed in staff meetings in May and August.

second conversation with you and myself on March 25, 1981 regarding meal money for the women's basketball team, I was not given orally or in writing during my entire tenure with the Athletic Department, under your administration, any direction as to how much money the team should be given per meal, per day, or per trip. I received all monies, in cash, from our business manager, Mr. Curtis Watkins. I did not request any money from him for meals, nor did I sign or okay any requesting vouchers.

Stockard testified that she did not plan specific allowances for each player, but that Curtis Watkins anticipated the total amount the team would need on road trips, prepared a requisition, and distributed the money to the coaches in cash.[7] She testified that she knew from previous experience as a coach that players were to receive $5.00 for breakfast, $5.00 for lunch, and $7.50 for dinner, but that UDC had provided no information on specific limitations on meal allowances.[8] She did not regard meals that players did not eat—including the inflight snacks or the dinners at Paschal's (which many found "inedible")—as counting against the per diem meal allowance. Her position, in essence, was that her distribution of $40.00 for a three-day trip did not substantially violate the departmental $13.25 per day meal allowance policy ($13.25 × 3 = $39.75).[9] Acknowledging that she had submitted the receipt for lodging at Paschal's, she asserted that she did not do so to claim the expenses against the amount disbursed to her, and that she was unaware of the $54.00 credit reduced to zero that the receipt showed.

Following Stockard's March 25 meeting with Moss, she informed her assistant coach, Steven Haynes, that she had been fired. The news spread quickly through the university community, and members of the team came to Stockard to ask her the reason why. She told them to "[g]o ask Mr. Moss." On March 25, Theresa Snead and Alice Butler, co-captains of the team, went to Moss for an explanation of the reasons for Stockard's discharge. Snead testified that Moss told them Stockard had been fired for "misappropriation of funds," and that her understanding of the statement was that "it was just like he was saying she had been stealing." Snead testified that when Moss asked her how much meal money she had received in Atlanta, she told him the "normal amount ... $40; $5.00 for breakfast, $5.00 for lunch and $7.50 for dinner."

On the same day, Moss summoned assistant coach Haynes and, according to Haynes, told him that "he had brought me in to make it official to me that he was firing Ms. Stockard for misappropriation of funds. And he wanted me to look at this Atlanta meal sheet to see if I agreed with the signature that was on it.... And the meal slip that he showed me looked okay. So I told him that I agreed with it."

Shortly after Stockard was discharged, a team meeting was held which Moss attended. Stockard was present but left before the meeting was over. According to team member Louise Spriggs, Moss stated that "they had decided to let [Stockard] go because it was a misappropriation of funds." Student assistant basketball coach Leroy West, also present at the meeting, stated that Moss had said "Ms. Stockard mis-

7. Stockard testified that Watkins' money-handling practices were questionable (noting that, for the Atlanta trip, cash was counted out in a broom closet at the D.C. Armory during a game, Watkins never asking for a receipt), and that she recommended a return to the system that prevailed before he was hired whereby the coach would estimate the amount of money needed, and vouchers would be prepared in Moss's office and checks distributed directly to the coach instead of through Watkins.

8. AIAW regulations provided that players were to receive no more than $5.00 for breakfast,

$5.00 for lunch, $1.75 for a snack and $6.00 for dinner, for a total of $17.75 per day per player.

9. An internal audit later conducted by UDC agreed that the "upper limit" for meal money was $39.75 per player for the entire trip, but concluded that Stockard's payments of $145 for dinner at Paschal's on December 19 and $39 for breakfast the next day were impermissible. The audit also expressed the view that the reduction of the $54 positive balance on the hotel receipt indicated that the money had been paid to someone.

handled money in the budget." Moss and Best, by contrast, testified that Moss had never told anyone Stockard has misappropriated funds.

### B. *Proceedings Below*

Stockard filed the instant suit in March 1982, naming as defendants Moss, Best, the Board of Trustees of UDC, and the District. The complaint sought compensatory and punitive damages, alleging breach of contract, libel and slander, tortious interference with contract, intentional infliction of emotional distress and sex discrimination.[10] The case was tried to a jury in April and May 1986.

At the close of the plaintiff's case, the defendants moved for a directed verdict on all counts. Judge Shuker granted the motion in part, disposing of all claims against Best, the interference with contract claims, and the intentional infliction of emotional distress count. As to the libel, slander and breach of contract counts, he was unable to say that the motions were without merit in light of the evidence so far, and took them under advisement.

At the close of all the evidence, the defendants renewed their motions for directed verdict. Ruling from the bench, the judge granted the motions with respect to the libel claims.[11] He also refused to allow the claim for punitive damages to go to the jury. While continuing to take the motions on the slander and breach of contract counts under advisement, the judge ruled that on the facts of this case Stockard was a private figure, and that the *New York Times* standard therefore did not apply. He submitted the slander and breach of contract counts to the jury under instructions to which no party objected.

On May 6, 1986, the jury returned a verdict in Stockard's favor, awarding her $18,000 for breach of contract and $300,000 for slander. The defendants filed post-trial motions, seeking, among other relief, a remittitur, and the judge disposed of all pending motions in a detailed Memorandum Opinion and Order on May 11. He rejected the contention that Moss was immune from civil liability for his statements under an absolute privilege for public officials acting in their official capacity. Finding persuasive the reasoning of *Stukuls v. State,* 42 N.Y.2d 272, 397 N.Y.S.2d 740, 366 N.E.2d 829 (1977), he concluded that the policy reasons for absolute immunity did not compel extension of the privilege to lesser "officials" such as Moss. He accepted the argument, however, that Moss's statements fell within a qualified privilege for communications which the person making the statement has an interest in making, or a duty (or the honest belief that he has a duty) to make, to another person having a corresponding interest or duty. Recognizing that this privilege was defeasible only on a showing of malice, he concluded there was sufficient evidence at trial from which the jury could find Moss had made the statements without adequately investigating whether the asserted misappropriation was true, and that this constituted recklessness enough to overcome the qualified privilege.

Regarding the breach of contract claim, the judge found that the defendants were estopped from denying the existence of a contract for the 1981–82 season, but that

---

**10.** The sex discrimination claim was also pursued in the District of Columbia Office of Human Rights. Pursuant to a settlement agreement entered on October 4, 1982, UDC, while denying all allegations of discrimination, agreed to reinstate Stockard as women's basketball coach and remit back pay in the amount of $21,157.50, representing pay for the 1981–82 season and for the part of the 1982–83 season that had elapsed up to the date of reinstatement. Stockard agreed to withdraw her human rights claim. The settlement agreement expressly provided that "this agreement shall in no way affect Civil Action No. 4362–82 ... now pending in Superior Court." Stockard apparently aban-

doned the sex discrimination count for purposes of trial. It was not mentioned in her pretrial statement, and no jury instructions were issued concerning the claim.

**11.** The libel claims were based on two memoranda from Moss to Stockard which indicated that copies were to be circulated to others. The judge concluded that the memoranda were within the ambit of a qualified privilege, that there was no evidence they were defamatory, or that either memo was ever published to the third parties who were to receive copies.

the evidence was insufficient for the jury to find a contract for the 1982–83 season. Accordingly, he remitted the contract damages awarded by the jury from $18,000 ($9,000 × 2 seasons) to $9,000. In response to the defendants' argument that the settlement agreement in Stockard's Human Rights Act claim had awarded her back pay for the 1981–82 and 1982–83 seasons, and that to permit any breach of contract verdict would allow a double recovery of the same damages, the judge cited the last paragraph of the settlement agreement providing that the settlement would "in no way affect" the pending civil action, and sustained the damages.

Finally, the judge ruled that "unless plaintiff accepts a remittitur, reducing the award for slander to $100,000, defendant shall be entitled to a new trial [on the issue of damages for slander only]." He found

> the award to be outrageous and unreasonable and, consequently, ... that the jury must have been improperly motivated. Giving the plaintiff the benefit of every legitimate inference, and viewing the evidence in a light most favorable to her, the Court can only conclude that this award exceeded *at least* by a factor of three the very outer limits of reasonableness. [Emphasis by the court.]

Stockard accepted the remittitur, preserving her right to appeal the judge's ruling.

## II. Absolute Privilege

Appellants contend that Moss's communication of the reason for Stockard's discharge to the team members and others, even if false and defamatory, was shielded by the absolute privilege recognized in *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959). Stockard counters that absolute immunity under *Barr* should be reserved for District of Columbia officials occupying only the highest echelons of the executive branch, or at least only those exercising delegated or redelegated governmental duties directly emanating from

those levels in the official hierarchy. She relies, as did the trial judge, on the reasoning of the New York Court of Appeals in *Stukuls v. State, supra,* in which the court rejected a claim of absolute immunity asserted by a state university vice-president for academic affairs as a complete defense to a defamation suit by a discharged member of the faculty arising from statements made during a tenure committee meeting. The court in *Stukuls* first acknowledged the trend among federal courts toward broadening official immunity that had culminated in the decision in *Barr.* It then noted that very few state courts had extended absolute immunity this far, but rather had reserved absolute immunity for only the highest officials and accorded lesser officials qualified immunity. The court concluded:

> [U]nless an official is a principal executive of a State or local government or is entrusted by law with administrative or executive policy-making responsibilities of considerable dimension, policy considerations do not require that he be given an absolute license to defame. The privilege exists to protect those who bear the greatest burdens of government or those to whose official functioning it is essential that they be insulated from the harassment and financial hazards that may accompany such suits for damages by the victims of even malicious libels or slander.

42 N.Y.2d at 278, 366 N.E.2d at 833.

The reasoning of the *Stukuls* court has substantial merit, but we conclude that to link the scope of immunity to the status of the official within the executive hierarchy would be inconsistent with the analysis we recently adopted in *District of Columbia v. Thompson, supra.* In our judgment the *Thompson* approach will ensure, just as effectively as *Stukuls'* test, that the shield of absolute immunity is no broader than necessary to effectuate its important purposes.[12]

---

**12.** This court has pending before it in *Thompson* a petition for rehearing en banc filed by the District of Columbia raising issues of exhaustion of administrative remedies—issues that, if resolved in the District's favor, conceivably could

moot the discussion of immunity in that case. We conclude, however, exercising our own judgment as a division, that the immunity analysis in *Thompson* is sound and that we would adopt it even if the *Thompson* opinion were vacated.

## A.

Justice Harlan's plurality opinion in *Barr* suggested that the scope of absolute immunity for executive officials was not to be defined by the *status* of the defendant official, or by the official function he or she *might* exercise in that capacity, but by the nature of the function which actually formed the basis for the suit in damages.[13] The plurality observed:

> We do not think that the principle ... can properly be restricted to executive officers of cabinet rank, .... The privilege is not a badge or emolument of exalted office, but an expression of a policy designed to aid in the effective functioning of government.... *It is not the title of his office but the duties with which the particular officer sought to be made to respond in damages is entrusted—the relation of the act complained of to "matters committed by law to his control or supervision,"—which must provide the guide in delineating the scope of the rule.*

360 U.S. at 572–74, 79 S.Ct. at 1340–41 (emphasis added; citations omitted). Consistent with this functional approach, the plurality held that discretionary acts within "the outer perimeter" of the official's line of duty, even if not expressly authorized or required by the agency's organic statute or superior officials, are encompassed by the privilege. *Id.* at 575, 79 S.Ct. at 1341.

Criticism of the manner in which *Barr* balanced the competing interests followed in the wake of the decision. Most commentators agreed with the dissenting Justices[14] that the public's valid interest in securing the exercise of official duties undisrupted by meritless defamation suits could be accommodated by a qualified privilege for lower-ranking executive officials— defeasible on a showing of malice or improper motive—without exacting the high "price" demanded by the Court's approach.[15] State courts, not obliged to strike the policy balance in the same manner as *Barr*, have approached the problem in diverse ways. *See* R. SACK, LIBEL, SLANDER, AND RELATED PROBLEMS, 289–94 (1980). Some have found *Barr's* reasoning compelling regardless of the state official's rank. As Prosser and Keeton observe, however:

> While there are a few state court decisions which appear to [apply the *Barr* rationale] to subordinate state officers, such courts in general have refused to accept the extension, and have recognized no absolute privilege on the part of such officials as superintendents of schools, mayors and aldermen, prosecuting attorneys and policemen, state investigators, and the like. Unless such an executive officer can claim immunity on the basis of a quasi-judicial or legislative function, he is held to be subject to a qualified privilege only.

W. KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 114, at 822 (5th ed. 1984) (footnotes omitted). The Restatement approach similarly reflects reluctance to ex-

---

**13.** Although only Justices Frankfurter, Clark and Whittaker joined in Justice Harlan's opinion, Justice Stewart's dissent accepted Justice Harlan's approach as a "lucid and persuasive analysis of the principles that should guide decision in this troublesome area of the law," but disagreed that the official's act in *Barr* was action in the line of duty. *Barr, supra,* 360 U.S. at 592, 79 S.Ct. at 1350 (Stewart, J., dissenting). Moreover, in the companion case of *Howard v. Lyons,* 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), Justice Harlan delivered a majority opinion applying the *Barr* analysis. Therefore, the plurality's reasoning in *Barr* represented the view of a majority of the Court. *See Expeditions Unlimited Aquatic Enter. v. Smithsonian Inst.,* 184 U.S.App.D.C. 397, 399 n. 4, 566 F.2d 289, 291 n. 4 (1977) (en banc), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978).

**14.** *See* 360 U.S. at 578, 585, 79 S.Ct. at 1343, 1346 (Warren, C.J., with whom Douglas, J., joined, dissenting) ("here the Court has given some amorphous group of officials ... an absolute privilege when their agency or their action is criticized.... [I]t will take a brave person to criticize government officials knowing that in reply they may libel him with immunity in the name of defending the agency and their own position.") *See also id.* at 586–92, 79 S.Ct. at 1347–50 (Brennan, J., dissenting).

**15.** *See, e.g.,* Becht, *The Absolute Privilege of the Executive in Defamation,* 15 VAND.L.REV. 1127 (1962); Handler & Klein, *The Defense of Privilege in Defamation Suits Against Government Executive Officials,* 74 HARV.L.REV. 44 (1960); Gray, *Private Wrongs of Public Servants,* 47 CAL. L.REV. 303 (1959).

tend absolute immunity from liability for reputational injury to every level of state government, and limits absolute privilege to superior executive officers of a state, according "inferior" officers a qualified, malice-defeasible, privilege. RESTATEMENT (SECOND) OF TORTS § 591 & official comment c (1977); *id.* § 598A. The court in *Stukuls* adhered to this dichotomy. 42 N.Y.2d at 276–79, 366 N.E.2d at 832–33.

### B.

In contrast, in *District of Columbia v. Thompson, supra,* this court implicitly rejected a rank-based distinction that reserves absolute immunity only for high-level ranking executive officials, leaving inferior officers only qualified immunity. Instead, the inquiry under *Thompson* focuses on the nature of the official conduct forming the basis of the cause of action. *Id.* at 295–96.[16] Specifically, the court adopted the refinement of *Barr* set forth in *Westfall v. Erwin, supra* note 16, which makes absolute immunity available when (1) the official acted within the "outer perimeter" of his official duties, and (2) the particular government function at issue was "discretionary" as opposed to "ministerial." [17] *Thompson, supra,* 570 A.2d at 294 & n. 14.

Determining whether an act fell "within the outer perimeter of the [official's] line of duty," *Barr v. Matteo, supra,* 360 U.S. at 575, 79 S.Ct. at 1341, calls for a relatively straight-forward identification of the act

giving rise to the suit and an analysis of the official's proper functions and duties. To satisfy this prong of the test, it is unnecessary for the acts to be expressly prescribed by statute or performed at the specific direction of a superior; rather,

> it is sufficient if they are done by an officer *in relation* to matters committed by law to his control or supervision ...; or that they have *more or less connection* with the general matters committed by law to his control or supervision ...; or that they are governed by a lawful requirement of the department under whose authority the officer is acting.

*Cooper v. O'Connor,* 69 App.D.C. 100, 104, 99 F.2d 135, 139 (citations, internal quotation marks omitted; emphasis in original), *cert. denied,* 305 U.S. 643, 59 S.Ct. 146, 83 L.Ed. 414 (1938).

Distinguishing discretionary acts from ministerial ones, by contrast, involves a more complex analysis which, as *Thompson* made clear, goes beyond determining simply whether the act entailed a choice among alternatives. It seeks to ascertain "whether the governmental action at issue allows significant enough application of choice to justify official immunity, in order to assure 'fearless, vigorous, and effective' decisionmaking." *Thompson, supra,* 570 A.2d at 297. In each case, the court, as a matter of law,[18] must balance the contend-

---

**16.** This functional analysis—as opposed to one based upon the rank of the defendant official—is consistent with the manner in which the Supreme Court, in the wake of *Barr,* has balanced *the competing policy interests to decide whether* absolute immunity bars a common law tort action against a federal official. In *Westfall v. Erwin,* 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988), the Court observed:

> this Court has long favored a "functional" inquiry—immunity attaches to particular official functions, not to particular offices. The adoption of this functional approach reflects the Court's concern ... that federal officials be granted absolute immunity only insofar as the benefits of immunity outweigh the costs. Because the benefits of official immunity lie principally in avoiding disruption of governmental functions, the inquiry into whether absolute immunity is warranted in a particular context depends on the degree to which the official function would suffer under the threat of prospective litigation.

*Id.* at 296 n. 3, 108 S.Ct. at 583 n. 3 (citations omitted).

**17.** Notably, the United States Court of Appeals for the District of Columbia Circuit, applying District of Columbia case law, articulated an identical two-pronged test to determine the immunity of District of Columbia officials long before *Westfall* and *Thompson* were decided, in a decision not binding on us under *M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971). *See Doe v. McMillan,* 148 U.S.App.D.C. 280, 293, 459 F.2d 1304, 1317 (1972), *reversed in part on other grounds,* 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973). The Supreme Court in *McMillan* found no reason to disturb the circuit court's disposition of issues concerning the immunity of District of Columbia officials. 412 U.S. at 324 n. 15, 93 S.Ct. at 2031 n. 15.

**18.** Absolute official immunity operates to bar the plaintiff's action from the outset of the suit. *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96

ing interests and determine whether society's concern to shield the particular government function at issue from the disruptive effects of civil litigation requires subordinating the vindication of private injuries otherwise compensable at law.

To assist in this task, *Thompson* identified four relevant policy factors: (1) the nature of the injury,[19] (2) the availability of alternate remedies, (3) the ability of the courts to judge fault without unduly invading the executive's function, and (4) the importance of protecting particular kinds of acts. Viewing the case from both the plaintiff's and the official's perspective, the court must evaluate whether the contribution to effective government of the immunity urged would or would not outweigh the harm to the plaintiff. *Id.* The inquiry

must evidence due regard for the *Westfall* Court's admonition that the scope of immunity should be no broader than necessary to ensure effective governance. 484 U.S. at 298–99, 108 S.Ct. at 584–85.[20]

■ As in *Thompson*, the present record does not enable us to weigh the pertinent factors and discern where the appropriate balance of interests lies. Moreover, we lack the valuable judgment of the trial judge gained from his familiarity with the case. We accordingly do not reach the question whether Moss's actions were shielded by an absolute privilege, but instead remand the case to the trial judge to resolve this issue in accordance with the standards articulated in *Thompson* and this opinion.[21] The judge should: (1) ascer-

S.Ct. 984, 989 n. 13, 47 L.Ed.2d 128 (1976). Unlike qualified immunity under 42 U.S.C. § 1983, a defense that may require a factual inquiry at trial into matters such as the good faith of the official, *id.; Hobson v. Wilson,* 237 U.S.App.D.C. 219, 242–44, 737 F.2d 1, 24–26 (1984), the elements underlying absolute immunity are objective in nature and ascertainable by the judge. Accordingly, whether the act in question is subject to official immunity is an issue for the court, appropriately raised either in the context of a motion to dismiss for failure to state a claim under Super.Ct.Civ.R. 12(b)(6) (1989), *see, e.g., C.M. Clark Ins. Agency v. Maxwell,* 156 U.S.App.D.C. 240, 479 F.2d 1223 (1973); *Donald v. Orfila,* 618 F.Supp. 645, 647 (D.D.C.1985), *aff'd,* 252 U.S.App.D.C. 134, 788 F.2d 36 (1986), or in a motion for summary judgment under Super.Ct.Civ.R. 56, *see Expeditions Unlimited Aquatic Enter., supra* note 13, 184 U.S.App.D.C. at 400 n. 5, 566 F.2d at 292 n. 5 As we indicated in *Thompson,* however, the burden of establishing that the official function in question merits absolute immunity rests on the defendant official. 570 A.2d at 298. *See also Westfall, supra* note 16, 484 U.S. at 299, 108 S.Ct. at 585.

**19.** Although we suggested in passing that this factor cut against the plaintiff in *Thompson* because the injury in defamation cases was "economic" and not "physical", 570 A.2d at 297, we did not intend to undervalue the strength of an individual's interest in reputational integrity. To the contrary, "the common law of defamation in the District of Columbia has long sought to provide the defamed Plaintiff a maximum standard of protection...." *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78, 87 (D.C.1980), *cert. denied,* 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981). *See also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974) (individual's

right to protect good name "reflects our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty" [citation and internal quotation marks omitted] ); *Doe v. McMillan, supra* note 17, 412 U.S. at 323–24, 93 S.Ct. at 2030, *citing Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971) (recognizing that court should approach question of official immunity with caution "where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him" [internal quotation marks omitted] ).

**20.** *See also Doe v. McMillan, supra* note 17, 412 U.S. at 320, 93 S.Ct. at 2028 (test involves a "discerning inquiry into whether the contributions of immunity to effective government in particular contexts outweigh the perhaps recurring harm to individual citizens").

**21.** Although we decline to follow the *Stukuls* court's categorical extension of only qualified immunity to "inferior" executive officers, *Thompson's* functional analysis does not preclude the trial judge from taking into account the policy considerations which led the *Stukuls* court to withhold absolute immunity from some public university officials. Obviously, the official's rank will bear on the scope of his authority and the degree to which immunity is required to ensure unfettered discharge of his important duties. *See Barr, supra,* 360 U.S. at 573, 79 S.Ct. at 1340. In other words, nothing in *Thompson* suggests that the four policy factors listed there are exclusive or that they exhaust all possible relevant circumstances. The discretionary/ministerial inquiry requires a case-specific balancing of interests, and *Thompson's* identifi-

tain whether Moss's communications to the team fell within the "outer perimeter" of his official duties, and (2), based upon findings on the policy factors identified above, as well as others the judge deems relevant, decide whether those acts involved the exercise of a choice whose contribution to effective government outweighs the harm to plaintiff that would result from application of official immunity—thus making the acts "discretionary" within the meaning of *Thompson.*

### III. Directed Verdict on the Slander Claim

#### A. *Falsity of the Statements*

Appellants contend that Stockard failed to introduce evidence sufficient to support a jury finding that Moss's statement that Stockard had "misappropriated funds" was untrue. Asserting that Stockard either was unaware of policies she should have known, or deliberately failed to abide by them, they rely on Stockard's undisputed testimony that it was her practice to divide funds disbursed for "road trip" meal expenses evenly among the players, after withholding amounts which her experience as a coach indicated would be necessary to cover travel, incidental and other unforeseen expenses. This practice, appellants contend, was inconsistent with departmental and AIAW meal allowance policies, which dictated a fixed amount per player per day. With regard to the Atlanta trip, appellants contend Stockard essentially admitted that her total food expenditure exceeded the amount permitted by depart-

mental policy, which can lead only to the conclusion that she wrongly appropriated to herself and others UDC funds entrusted to her care.

Stockard in turn points to evidence that the meal money distributions for the Atlanta trip did not substantially exceed departmental guidelines, that departmental money-handling policies were ill-defined and constantly in flux, and that she accounted for all expenditures and submitted receipts to document them. The UDC audit, she argues, did not incriminate her but showed instead that her $40 per player distribution exceeded departmental limits for meal money by about 25 cents per player, a basis the jury could readily find too frail to support a charge of misappropriation.

In defamation law, it is often said that truth is an absolute defense, *Global Van Lines v. Kleinow,* 411 A.2d 62, 64 (D.C. 1980), but since *New York Times v. Sullivan, supra,* at least with respect to media defendants, the weight of authority has been that falsity must be pleaded *and proven* by the plaintiff.[22] The relevant standardized jury instruction states that "[t]he plaintiff has the burden of establishing that the publication complained of is false," drawing no distinction based on the identity of the defendant. Standardized Civil Jury Instructions for the District of Columbia, No. 17–7 (1985 Supp.) *See also Harrison v. Washington Post,* 391 A.2d 781, 783 (D.C.1978) (defamation plaintiff must show statements were false, defamatory and published with some degree of fault).[23]

---

cation of policy factors was intended to facilitate, not inhibit, the trial court's search for the proper balance.

**22.** *Tavoulareas v. Piro,* 260 U.S.App.D.C. 39, 60, 817 F.2d 762, 783 (en banc), *cert. denied,* 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1987). In *Philadelphia Newspapers v. Hepps,* 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Supreme Court suggested that the common law's allocation of the burden of persuasion, at least with respect to statements on issues of public concern by a media defendant, may violate the First Amendment.

**23.** In *Gertz v. Robert Welch, Inc., supra,* note 19, the Supreme Court held that the common law rule allowing a defamation plaintiff to recover

merely upon proof that the defendant made a defamatory statement—which placed the burden of proving truth on the defendant—unduly impinged on the public's constitutionally protected interest in the free flow of information. This holding left the states free to decide the standard of fault; *Gertz* only precluded imposition of liability without proof of fault against a media defendant. In *Phillips v. Evening Star Newspaper Co., supra* note 19, 424 A.2d at 87, this court adopted the principles of *Gertz* to abrogate the common law rule of strict liability theretofore prevailing in the District of Columbia. *See Chaloner v. Washington Post Co.,* 36 App.D.C. 231, 233 (1911). Recognizing the strength of a private individual's interest in freedom from reputational injury, the court held

■ As a threshold matter, the court must determine whether a statement can be construed as defamatory. *Howard Univ. v. Best,* 484 A.2d 958, 989 (D.C.1984), *appeal after remand,* 547 A.2d 144 (D.C. 1988). A statement is "defamatory" if it tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community. *Id.* at 989; *Afro–American Publishing Co. v. Jaffe,* 125 U.S. App.D.C. 70, 76, 366 F.2d 649, 654 (1966) (en banc). If it appears that the statements are at least capable of a defamatory meaning, whether they were defamatory and false are questions of fact to be resolved by the jury. *Olinger v. American Savings & Loan Ass'n,* 133 U.S. App.D.C. 107, 109, 409 F.2d 142, 144 (1969) (per curiam). Here, both sides offered evidence to support their positions on falsity, and the issue was properly submitted to the jury.

In accordance with the Standardized Jury Instruction, the judge told the jury that "the plaintiff has the burden of establishing that [the] communication ... complained of was false." He further stated that if the jury found the publication to be substantially true—in the sense that its "gist" or "sting" was true—the statement was not false. In determining what the "gist" of a statement is, the jury is not bound by technical meanings of terms such as "misappropriation", which appellants contend accurately portrayed Stockard's conduct because she used disbursed funds in a manner inconsistent with department policy. Rather, the "publication must be taken as a whole, and in the sense in which it would be understood by [those] to whom it was addressed." *Afro–American Publishing Co., supra,* 125 U.S.App.D.C. at 76, 366 F.2d at 655.

■ Measured by this standard, the evidence supports the legitimate inference, which we are obliged to draw in Stockard's favor,[24] that those to whom the "misappropriation of funds" statements were directed understood them to mean Stockard had engaged in some form of deliberate wrongdoing. At least one witness testified that she understood Moss's statement to mean Stockard had been stealing. Considering the circumstances of the statements and their implication, a reasonable juror could also find that the statements were false. Thus, the judge's refusal to direct a verdict on this issue was correct.

### B. *Qualified "Common Interest" Privilege*

Judge Shuker concluded that Moss's statements were subject to a qualified privilege. As an alternative to their absolute immunity argument, appellants contend that a directed verdict on the slander claim should have been granted because Stockard failed to overcome the privilege with the requisite showing of malice.[25] Included

---

that "the basic standard of care in the District of Columbia for media defamation of private plaintiffs, so far as actual damages are involved, becomes translated by *Gertz* from strict liability to its next most proximate standard of care—that of negligence." *Phillips,* 424 A.2d at 87.

Because the law after *Phillips* allocates to the plaintiff the burden of proving at least negligence on the defendant's part, it is appropriate to require the plaintiff to plead and prove the elements of a negligence cause of action, among which falsity logically is a component in the defamation context. *See Jacron Sales Co. v. Sindorf,* 276 Md. 580, 596–98, 350 A.2d 688, 698 (1976). Despite its specification of the standard of care for *media* defendants, *Phillips* cannot be limited to this type of defamation defendant. In *Dun & Bradstreet v. Greenmoss Builders,* 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), a majority of Justices of the Supreme Court specifically rejected the notion that the applicability of *Gertz* should turn on this distinction.

*See id.* at 773, 105 S.Ct. at 2952 (White, J., concurring in the result); *id.* at 781–84, 105 S.Ct. at 2956–58 (Brennan, J., with whom Marshall, Blackmun and Stevens, JJ., joined, dissenting) (media/nonmedia distinction inconsistent with First Amendment principle that value of speech does not turn on nature of its source).

24. *See Lenkin–N Limited Partnership v. Nace,* 568 A.2d 474, 477 (D.C.1990), *citing Ceco Corp. v. Coleman,* 441 A.2d 940, 944 (D.C.1982), and *Mahallati v. Williams,* 479 A.2d 300, 304 (D.C. 1984).

25. Because it was not raised as a defense below, *see Henderson v. District of Columbia,* 493 A.2d 982, 994–95 (D.C.1985), we need not address appellants' assertion in their briefs that Stockard, in telling the players to ask Moss why she had been fired, may have impliedly "consented" to the defamatory statement. *See Kraft v. William Alanson White Psychiatric Found.,* 498 A.2d 1145, 1150 (D.C.1985).

within this claim is an argument that the judge improperly instructed the jury on the standard of malice.

Qualified or conditional privileges "are based upon a public policy that recognizes that it is desirable that true information be given whenever it is reasonably necessary for the protection of the actor's own interests, the interests of a third person or certain interests of the public." RESTATEMENT (SECOND) OF TORTS, *supra*, title B introductory note. Where the facts surrounding publication are undisputed, whether a statement is privileged is a question of law for the court. *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C.1983); *Roland v. d'Arazien*, 222 U.S.App.D.C. 203, 205, 685 F.2d 653, 655 (1982).[26]

■ To come within the protection of the "common interest" privilege, the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest. *Ingber v. Ross*, 479 A.2d 1256, 1264 n. 8, 1268–69 (D.C.1984); *Smith v. District of Columbia*, 399 A.2d 213, 220 (D.C.1979). "Excessive publication," defined as publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest, will render the statement non-privileged. *See, e.g., Joftes v. Kaufman*, 324 F.Supp. 660, 664 (D.D.C.1971) (grounds for privilege do not exist when employer publishes reason for employee's discharge to persons who have no legitimate interest in knowing it).

The privilege also may be defeated by a showing that it was made in bad faith. Once the court determines a statement is subject to the "common interest" privilege,

the defendant "will be presumed to have been actuated by pure motives in its publication. In order to rebut this presumption, express malice or malice in fact must be shown [by the plaintiff]." *Ford Motor Credit v. Holland*, 367 A.2d 1311, 1314 (D.C.1977), *quoting Ashford v. Evening Star Newspaper Co.*, 41 App.D.C. 395, 405 (1914). Unless the statement itself is "so excessive, intemperate, unreasonable, and abusive as to forbid any other reasonable conclusion than that the defendant was actuated by express malice," malice must be proven by extrinsic evidence. *Id.*

Appellants contend that there was insufficient evidence to create a jury issue on whether Moss had lost the privilege. Although, as will be apparent, we reject that argument, the judge's instructions on the issue are problematical and require extended discussion. The judge stated that, if a statement by Moss was otherwise within the privilege, the jury still could find for Stockard if it found that the statement was made in "bad faith." He explained that "bad faith" meant "either that it was made by reason of malice or on unreasonable, *on a lack of reasonable grounds to believe that [the statement] was true* or that it was made in a manner beyond the scope or excessive so as to indicate an intentional, reckless, or callous disregard of the rights of the plaintiff" (emphasis added). In his post-trial opinion and order, the judge concluded that Stockard had introduced sufficient evidence to support a finding of "recklessness or negligence on the part of the defendant Moss through his failure to investigate the allegation of misappropriation before making the defamatory statements."

The judge's instructions thus give rise to two questions. First, does a failure to undertake a reasonable inquiry prior to publication, without more, constitute the

---

**26.** Even though the issue whether the statements were within the ambit of an interest common to Moss and the players is of a kind usually reserved for the court, the judge instructed the jury:

> If you find that publication of the statement complained of relates to a matter which was a common interest to the parties to whom it

was published or communicated and that the means of publication was reasonably adapted to the protection of that interest, you are instructed that the publication would be qualifiedly privileged, and your verdict should be for the defendant, unless you find that the publication was made in bad faith.

malice necessary to overcome the qualified "common interest" privilege? The judge appeared to hold that it does; we conclude that it does not. Second, did this error in the instruction affect the fairness of the jury verdict? Under the plain error standard of review applicable here, we conclude that it did not.

### 1.

■ Malice, in the context of a qualified privilege, is the equivalent of bad faith. It is

> the doing of an act without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effects upon the rights or feelings of others as to constitute ill will.

*Mosrie, supra,* 467 A.2d at 477; *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 290 (D.C.1977); *Ford Motor Credit, supra,* 367 A.2d at 1314. Although our decisions indicate that a qualified privilege exists only if the publisher believes, with reasonable grounds, that the statement is true, *see Mosrie, supra,* 467 A.2d at 477; *Chatelain, supra,* 374 A.2d at 290; *Afro–American Publishing Co. v. Jaffe, supra,* 125 U.S.App.D.C. at 77, 366 F.2d at 656, this formulation does not mean that the requirement of "malice", for purposes of overcoming a common law qualified privilege, is satisfied if the defendant has done no more than fail to undertake a reasonable inquiry as to the truth of the assertion prior to publication—conduct amounting to ordinary negligence.[27] As we explained in *Ford Motor Credit, supra:*

> A concept of reasonableness is applied, meaning that the existence of the privilege is said to depend on the facts as

they *reasonably* appear to the person whose liability is in question. A qualified privilege will exist only if the publisher ... believes his statements to be true and has reasonable grounds for his belief. It is nevertheless evident that for an act to be *un* reasonable within this context it must be more than negligent. 367 A.2d at 1314. [Emphasis in original; citation omitted.]

We noted in that case that even if the defendant automobile finance company had had a duty to take steps to verify the truth of information in its possession before reporting it to the credit bureau, and had acted negligently in failing to do so, a "failure to investigate, by itself, does not establish bad faith." *Id.* at 1316.

■ On the basis of *Ford's* recognition that "unreasonableness" in the context of a qualified privilege refers to more than ordinary negligence, *id.* at 1314, we conclude that a failure to observe an ordinary degree of care in ascertaining the truth of an assertion before publishing it to others does not alone yield the bad faith or ill will necessary to overcome a qualified privilege. Rather, the statement must be published at least with reckless or callous disregard for its effect upon the reputation of the plaintiff.[28]

In addition to its firm footing in our decisions, this conclusion is dictated by the evolution in the law following the Supreme Court's determination in *Gertz v. Robert Welch, Inc., supra* note 19, that strict liability for defamation may offend the Constitution. At common law, qualified privileges carved out a limited zone of protection for certain types of communications

---

**27.** The proposition that the defendant asserting a qualified privilege defense must have an honest belief that the statement is true and a reasonable basis for that belief "is quite different from saying that every negligent act is committed in bad faith." *H.E. Crawford Co. v. Dun & Bradstreet,* 241 F.2d 387, 399 (4th Cir.1957). The "reasonable belief" standard seems to relate to the threshold inquiry as to whether the statement is subject to a qualified privilege, *Ford Motor Credit, supra,* 367 A.2d at 1314 (*existence* of privilege depends on facts as they reasonably appear to person asserting privilege), and to the rule that proof that the statement was in fact false is alone insufficient to show malice and

rebut the presumption that the privileged statement was made in good faith. *H.E. Crawford Co., supra,* 241 F.2d at 399.

**28.** This is in accord with Standardized Civil Jury Instructions for the District of Columbia No. 17–13, which states:

> [M]alice may also be present in the eyes of the law if you determine by a preponderance of the evidence that the defendant's conduct in publishing the statement complained of constituted a callous or reckless disregard of the rights of the plaintiff.

that would otherwise carry strict liability for defamation. Some jurisdictions held a failure to undertake a reasonable investigation as to the truth of the statement—ordinary negligence—sufficient to defeat the privilege. Others, like the District of Columbia and the neighboring jurisdictions of Maryland, *see Jacron Sales Co. v. Sindorf,* *supra* note 23, 276 Md. at 598–602, 350 A.2d at 699–700, and Virginia, *see The Gazette v. Harris,* 229 Va. 1, 18–19, 325 S.E.2d 713, 727, *cert. denied,* 472 U.S. 1032, 105 S.Ct. 3513, 87 L.Ed.2d 643 (1985) *and* 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 653 (1985), required more, *viz.,* proof of some form of malice.

In the wake of *Gertz's* determination that the states could no longer impose liability for defamation without some degree of fault on the defendant's part, questions arose about the vitality of conditional privileges defeasible on a showing that the defendant had failed to exercise due care to ascertain falsity before publication. *See* Anderson, *Libel and Press Self-Censorship,* 53 TEX.L.REV. 422, 443 n. 97 (1975); RESTATEMENT (SECOND) OF TORTS, *supra,* § 599 comment d (after *Gertz,* "mere negligence as to falsity, being required for all actions of defamation, is no longer treated as sufficient to constitute abuse of a conditional privilege"). In light of *Gertz,* this court in *Phillips v. Evening Star Newspaper Co., supra* note 19, abrogated the former rule exposing a defendant to liability for defamation whether or not he had exercised due care. 424 A.2d at 87. To prevail under *Phillips,* a defamation plaintiff must now plead and prove, at a minimum, the defendant's lack of ordinary care regardless of whether a qualified privilege applies. *Id.* But if a plaintiff, to satisfy the burden of proving a prima facie case, may rely on showing a failure to make a reasonable investigation as to truth before publication of the statement, logically he should not be able to rely on the same proof—and no more—to defeat a qualified privilege defense.

Of course, a failure to investigate the truth of a statement may be part of or accompanied by conduct rising to the level of a reckless or callous disregard for the reputation of the subject of a statement, particularly when the nature of the statement makes reputational injury likely and the defendant is aware of its probable falsity.[29] In the present case, however, the judge phrased his instruction to the jury in the disjunctive, charging it that the privilege was overcome if it found: *"either* that [the statement] was [1] made by reason of malice *or* [2] on unreasonable, on a lack of reasonable grounds to believe the statement was true, *or* [3] that it was made in a manner beyond the scope or excessive so as to indicate an intentional, reckless, or callous disregard of the rights of the plaintiff" (emphasis added). The second of these independent formulations indicates erroneously that the jury could conclude Moss had made the statements in bad faith—thereby losing the qualified privilege—if it found only that he lacked reasonable grounds to believe the misappropriation charge was true at the time he made

---

**29.** Appellants assert that, after *Gertz,* only "actual malice" should be sufficient to defeat a common law qualified privilege. Common law malice is to be distinguished from the constitutional *New York Times* "actual malice" standard. The former looks to ill will or enmity as the primary motive of the defendant; the recklessness or callousness contemplated there manifests those states of mind. *Mosrie, supra,* 467 A.2d at 477. In its constitutional sense, " 'actual malice' is unfortunately confusing in that it has nothing to do with bad motive or ill will." *Harte–Hanks Communications, Inc. v. Connaughton,* —— U.S. ——, 109 S.Ct. 2678, 2685 & n. 7, 105 L.Ed.2d 562 (1989). Rather, this standard is rooted in the First Amendment and in society's interest in

free expression concerning public officials and public figures. In these circumstances, the state's interest in affording a remedy for reputational injury prevails only when the speaker publishes defamation with knowledge of its falsity or with reckless disregard of whether it was false or not. *See Philadelphia Newspapers v. Hepps, supra* note 22, 475 U.S. at 771–74, 106 S.Ct. at 1560–62. While we conclude that *Gertz* and *Phillips* preclude defeasance of a qualified privilege merely on a showing of ordinary negligence, we do not agree that those decisions compel any change in our common law malice standard—which has always emphasized bad faith and evil motive.

the statement.[30]

## 2.

■ We must decide, therefore, whether the partly erroneous instruction requires reversal of the jury's verdict on defamation. Appellants made no objection to any of the jury instructions, including those relating to the qualified privilege or the nature of malice necessary to overcome it, either before or after the jury retired. Superior Ct.Civ.R. 51 (1989) thus precludes our reversal on this ground unless we conclude that a miscarriage of justice has occurred. *District of Columbia v. Mitchell*, 533 A.2d 629, 637 (D.C.1987), *citing Ceco Corp. v. Coleman*, 441 A.2d 940, 947 (D.C. 1982); *Washington Welfare Ass'n v. Poindexter*, 479 A.2d 313, 317 (D.C.1984). We can find no such miscarriage here. Jury instructions must be viewed as a whole. *See United States v. Park*, 421 U.S. 658, 674–75, 95 S.Ct. 1903, 1912–13, 44 L.Ed.2d 489 (1975). The jury instruction began by emphasizing correctly that bad faith was necessary to overcome the privilege. Although it then seemingly equated malice with "lack of reasonable grounds to believe the statement was true," without explication, it continued immediately with language asking whether the statement was made in a manner "beyond the scope" so as to indicate "an intentional, reckless, or callous disregard of the rights of the plaintiff"—the core of common law malice. *Mosrie, supra*, 467 A.2d at 477. Moreover, throughout his closing argument, Stockard's counsel emphasized that the evidence showed not merely that Moss had failed to undertake reasonable inquiry, but that he was actually aware of the falsity of the misrepresentation charge. *See Park, supra*, 421 U.S. at 674–75 & n. 16, 95 S.Ct. at 1913 & n. 16 (citations omitted) (claim of instructional error must be "considered in the context of the entire record of the *trial*," including argument (Supreme Court's emphasis)).

Finally, we are satisfied that in fact there was substantial evidence allowing the jury to find that Moss had made the statements in bad faith so as to defeat his qualified privilege. That evidence, which we summarize briefly, requires rejection both of the claim of plain error in the instruction and of appellants' claim that Stockard's showing of common law malice was insufficient as a matter of law.

In arguing that Moss knew the defamatory statements were false, Stockard relied on evidence rebutting testimony by Moss and other university officials that Stockard had misrepresented her expenses on the Atlanta trip. On direct examination, Moss testified that his suspicions were aroused when Stockard submitted a hotel receipt even though the university had prepaid the lodging, and when Watkins gave bim a signed meal money receipt that did not indicate the amount distributed to each player, at the same time stating that Stockard had said the blank sheet could be used to justify expenses claimed for the Atlanta trip. On cross examination, Moss further testified that Stockard had claimed expenses exceeding $2,000 for the Atlanta trip, and told him in a meeting that she had paid for the hotel from her own pocket. Ms. Best also testified on direct that Stockard had told her she had paid the hotel bill.

Yet Stockard's notation on submitted receipts for the Atlanta trip, an exhibit in evidence at trial, only claimed expenses (and submitted supporting receipts) for an amount totalling $1,346.[31] Although Stockard submitted the hotel receipt, the $1,346 did not include lodging as an expense. Stockard testified that she never claimed

---

**30.** As explained previously, in denying appellants' post-trial motions, the judge equated Moss's lack of a reasonable inquiry with reckless disregard for falsity.

**31.** Moss testified he did not remember the notation on Stockard's receipts indicating she had claimed to have spent $1,346. The notation appears on one of several sheets of photocopied receipts accompanying Plaintiff's exhibit 3, the university auditor's report. It is in handwriting, and reads:

Receipts for Atlanta Trip
 Dec. 19, 20, 21 1980
 Amount Received $1,150.00
 Amount Spent 1,346.00

Stockard testified that she added the notation after the first meeting with Moss at which he returned the receipts to her.

the hotel bill as an expense, and that she told Moss the receipts she had submitted "were all there were." She also testified that when Moss confronted her with the blank meal money receipt, she denied submitting or signing it. Moss, when asked what documents supported his contention that Stockard claimed expenses exceeding $2,000, testified, "I remember a note attached to her stack of receipts when it came to me and it said, it totalled up all the receipts in the different areas; lodging, transportation and meals and it was in excess of $2,000." Although he insisted he had submitted this and all other documents to the university cashier (not keeping a copy for himself), no such document was tendered in evidence, and the university auditor made no reference to it in his testimony concerning his audit of the Atlanta trip. Despite the fact that Stockard claimed she had only spent $1,346 on the trip, Moss and Watkins signed and submitted to the university a departmental trip expense voucher for $2,301.52, naming Watkins as payee of a claimed refund in the amount of $1,151.52 ($2,301.52 expenses minus a $1,150 advance). Stockard testified that the first time she saw this document was after litigation commenced.

■ From this evidence, it was not unreasonable for the jury to infer that Moss was aware Stockard was not seeking to justify with falsified documents outlays exceeding legitimate expenses, and that he charged Stockard with misappropriation despite the inaccuracy of this characterization. In light of (a) the absence of documentary evidence corroborating Moss's and Best's testimony that Stockard claimed the hotel bill or other excessive expenses, (b) Stockard's trip expense submissions including a signed meal money sheet indicating that each player had received $40 and not claiming lodging as an expense, (c) her own and players' testimony that their signatures on the blank meal money sheet were forgeries, and (d) testimony from players and the assistant coach that they had received $40 as indicated on the first meal money sheet,[32] a reasonable juror could well have discredited Moss's testimony that he honestly believed Stockard had been misrepresenting her expenses, and found that her wrongdoing at worst was a failure to observe the letter of department limitations on meal money distributions.[33] The jury could thus conclude that Moss made the charge of misappropriation with, at the least, reckless indifference to its effect on Stockard's reputation.

32. We reject appellants' argument that they are entitled to a new trial because certain evidentiary rulings deprived them of a fair opportunity to demonstrate Moss's honest belief in the truth of the misappropriation charge. The trial judge sustained a hearsay objection to Best's testimony as to how much money "a couple of students" told her they had received. In response, counsel made no offer of proof at all, and certainly did not assert the theory adverted to in appellants' brief—that the statement was not offered for a hearsay purpose, but rather to show the reasonableness of Moss's belief. Immediately thereafter, persuaded by defendants' point that the statement was offered to impeach Theresa Snead's inconsistent trial testimony, the court overruled a hearsay objection to Best's testimony that Snead had told her she had received only $21 for the trip, overlooking in this instance the defendants' failure to lay a proper foundation by confronting Snead with the inconsistency during her cross examination. The court was not so generous regarding an objection to testimony by a university official present during a meeting between Moss and Haynes showing that Haynes had told Moss he received only $20. Counsel also offered this to impeach

Haynes's trial testimony that he had received $40, but the court was unwilling to excuse the foundational defect on this occasion.

Appellants failed to bring to the trial court's attention the non-hearsay purpose relied upon in their brief, and we decline to remand for a new trial based on a theory of admissibility raised for the first time on appeal. Moreover, even if this theory had been asserted below, we note that Best was permitted to testify that Snead told her she had received only $21, and we conclude that the exclusion of the evidence had no effect on appellants' substantial rights. *See* Super.Ct.Civ.R. 61.

33. Indeed, appellants' theory at trial was that Moss at no time had meant even to suggest Stockard had engaged in deliberate wrongdoing, but rather that she was discharged for failing to adhere to departmental and AIAW policies regarding meal money distributions, and for her careless bookkeeping practices. The jury rejected this benign explanation of Moss's actions, finding that he indeed had stated to others that Stockard had "misappropriated" university funds.

## C. Stockard's Status as a Public Official/Public Figure

Appellants next assert that Stockard was either a public official or a limited-purpose public figure, and accordingly had to prove by clear and convincing evidence that Moss uttered his statements with actual malice, *i.e.*, intentional or reckless disregard for their falsity. See note 29, *supra*. Because of the constitutional dimensions of the issue, whether the plaintiff is subject to the *New York Times* standard is a question of law to be resolved by the court. *Dameron v. Washington Magazine, Inc.*, 250 U.S. App.D.C. 346, 350, 779 F.2d 736, 740 (1985), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986). Here, the judge concluded that Stockard was a private figure, and hence declined to instruct the jury on the need for proof by clear and convincing evidence. We uphold that ruling.

### 1. Public Official

In *New York Times v. Sullivan*, the Supreme Court required public officials suing for defamation to prove actual malice by clear and convincing evidence. Their need to prove greater fault by a greater degree of factual certainty than private plaintiffs stems from (1) the public's strong interest in robust and unfettered debate concerning issues related to governmental affairs, and (2) the fact that public officials, with superior access to the media, usually are better able than ordinary individuals to affect the outcome of those issues and to counteract the effects of negative publicity. *Rosenblatt v. Baer*, 383 U.S. 75, 85–86, 86 S.Ct. 669, 675–76, 15 L.Ed.2d 597 (1966); *Gertz v. Robert Welch, Inc.*, *supra* note 19, 418 U.S. at 344, 94 S.Ct. at 3009. In *New York Times*, the Court noted that "we have no occasion here to determine how far down into the lower ranks of government employees the 'public official' designation would extend for purposes of this rule." 376 U.S. at 283 n. 23, 84 S.Ct. at 727 n. 23. In *Rosenblatt* the Court elaborated:

> [T]he "public official" designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.

\* \* \* \* \* \*

> Where a position of government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and importance of all government employees, both elements we identified in *New York Times* are present....

*Rosenblatt, supra*, 383 U.S. at 85–86, 86 S.Ct. at 676 (footnotes omitted). Although the Court has not provided precise boundaries for the category, it has emphasized that "public official" cannot "be thought to include all public employees." *Hutchinson v. Proxmire*, 443 U.S. 111, 119 n. 8, 99 S.Ct. 2675, 2680 n. 8, 61 L.Ed.2d 411 (1979). Moreover, the *position* occupied by the official must be distinguished from the controversy in which he has become embroiled, for it is the former that must inherently invite public scrutiny. *Rosenblatt, supra*, 383 U.S. at 86 n. 13, 86 S.Ct. at 676 n. 13.

State courts have split on whether teachers in publicly sponsored educational organizations are "public officials" for purposes of defamation law. *See Richmond Newspapers v. Lipscomb*, 234 Va. 277, 286 n. 3, 362 S.E.2d 32, 36 n. 3 (1987), *cert. denied*, 486 U.S. 1023, 108 S.Ct. 1997, 100 L.Ed.2d 228 (1988); Comment, *Defamation of Teachers: Behind the Times?* 56 FORD.L. REV. 1191, 1196–1201 & nn. 54, 59, 66–68, 75 (1988). In *Richmond Newspapers*, the Virginia Supreme Court held that a public school teacher was not a public official because the public had no independent interest in her qualifications and importance beyond its general interest in those of all government employees. We conclude that a similar analysis applies in this case.

In some circumstances, the office of coach of a basketball team at a public university might inherently attract scrutiny and generate public interest in the qualifications of the person occupying it. In the circumstances of this case, however, any such interest would not result, even in part,

from the perception or reality that the coach had "substantial responsibility for or control over governmental affairs," *Rosenblatt, supra*, 383 U.S. at 85, 86 S.Ct. at 676; it could have resulted only from the nature of the controversy surrounding Stockard's termination. Such public concern is indistinguishable from the public's general interest in the qualifications—including the honesty—of any government employee. Stockard, like Lipscomb in the Virginia case, was a subordinate employee in a department of a public educational institution with minimal control over or responsibility for policy matters. The fact that inevitably she may have been a role model to the team members and affected their daily lives, *see* Comment, *supra*, 56 FORD.L.REV. at 1199, did not invest her position with a statute "invit[ing] public scrutiny and discussion ... apart from ... the particular charges in controversy." *Id.* at 87 n. 13, 86 S.Ct. at 676 n. 13. Stockard's position as a government employee was not one of such "apparent public importance," *id.* at 86, 86 S.Ct. at 676, as to implicate the twin considerations underlying *New York Times v. Sullivan.*

### 2. Limited–Purpose Public Figure

In *Curtis Publishing Company v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), the Supreme Court extended the *New York Times* rule to "public figures," defined generally as persons "intimately involved in the resolution of important public questions or [who], by reason of their fame, shape events in areas of concern to society at large." *Gertz, supra* note 19, 418 U.S. at 337, 94 S.Ct. at 3005, *quoting Butts, supra*, 388 U.S. at 164, 87 S.Ct. at 1996 (Warren, C.J., concurring in the result). Public figures fall into two categories: general purpose public figures who, because of their "position of such pervasive power and influence ...[,] are deemed public figures for all purposes," *id.* 418 U.S. at 345, 94 S.Ct. at 3009; and limited-purpose public figures, who assume roles "in the forefront of particular

public controversies in order to influence the resolution of the issues involved," and who are deemed public figures only for purposes of the controversy in which they are influential. *Id.*

Whether a defamation plaintiff is a public figure is an inquiry difficult enough to prompt one court to describe it as "trying to nail a jellyfish to the wall." *Rosanova v. Playboy Enterprises*, 411 F.Supp. 440, 443 (S.D.Ga.1976), *aff'd*, 580 F.2d 859 (5th Cir.1978). In *Waldbaum v. Fairchild Publications, Inc.*, 201 U.S.App.D.C. 301, 627 F.2d 1287, *cert. denied*, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980), the United States Court of Appeals for the District of Columbia Circuit set forth a three-part test for whether a defamation plaintiff is a limited-purpose public figure. Though we are not bound to follow *Waldbaum*, the court's methodology provides a road map through the terrain of Supreme Court precedent on point. Ultimately, "the touchstone remains whether the individual has assumed a role of special prominence in the affairs of society ... that invites attention and comment." *Tavoulareas v. Piro, supra* note 22, 260 U.S.App.D.C. at 50, 817 F.2d at 773 (citation and internal quotation marks omitted).

 Under the *Waldbaum* test, the court should first decide whether there is a public controversy, and determine its scope. As we understand *Waldbaum* and the later *en banc* decision in *Tavoulareas* applying it, this inquiry has two components: (1) whether the controversy to which the defamation relates was the subject of public discussion *prior* to the defamation, *see Tavoulareas, supra* note 22, 260 U.S.App. D.C. at 51–52, 817 F.2d at 772–74;[34] and (2) whether "a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution.' *Waldbaum, supra*, 201 U.S.App.D.C. at 311, 627 F.2d at 1297. A public controversy is "not simply a matter of interest to the public ... [but] a real dispute, the outcome of which affects the

---

**34.** Because the court should have no part in "deciding what should be debated," it "must look to what already were disputes" in resolving whether a public controversy exists. *Waldbaum, supra*, 201 U.S.App.D.C. at 311 & n. 25, 627 F.2d at 1297 & n. 25.

general public or some segment of it in an appreciable way.... [It] is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Id.* at 310, 627 F.2d at 1296.

Having defined the controversy, the court must next consider the plaintiff's role in it. The plaintiff must have achieved a special prominence in the debate, and either "must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." *Id.* at 311, 627 F.2d at 1297. If "he is shaping or is trying to shape the outcome of a particular public controversy, he is a public figure for that controversy; if not, he remains a private individual." *Id.* at 312 n. 32, 627 F.2d at 1298 n. 32.[35]

Once the first two requirements of *Waldbaum* are satisfied—there is a preexisting public controversy which the plaintiff undertakes to influence—the remaining question is whether the alleged defamation was germane to the plaintiff's participation in the controversy. *Id.* at 312, 627 F.2d at 1298. Defamatory statements wholly unrelated to the controversy do not merit *New York Times* protection.

Appellants seek to identify Stockard with the plaintiff in *Waldbaum,* the president of a large grocery cooperative (Greenbelt), who was "a leading advocate of certain precedent-breaking policies before coming to Greenbelt" and "an activist, projecting his own image and that of the cooperative far beyond the dollars and cents aspects of marketing" in an attempt to "influence the policies of firms in the supermarket industry and merchandising generally." *Id.* at

313–14, 627 F.2d at 1299–1300. The court found that these issues were public controversies affecting consumers, and that Waldbaum had "thrust himself into" these controversies. *Id.* at 314, 627 F.2d at 1300. Acknowledging that not everyone who participates in activities affecting the public becomes a public figure, it concluded: "Nevertheless, when one assumes a position of great influence within a specific area and uses that influence to advocate and practice controversial policies that affect others, he becomes a public figure for purposes of that debate." *Id.* Appellants argue that Stockard was a "public figure" within the "specific area" of women's basketball in general, and the women's basketball program at UDC in particular.

Applying the first prong of the *Waldbaum* test, it is stretching matters considerably to say that there was a "public controversy" about Stockard's firing at the time Moss made his statements. News of the firing had undoubtedly spread through the college community, and members of the community—especially the team members—were discussing it and demanding an explanation. Indeed, that is why they went to Stockard and then Moss, and why Moss responded to their inquiries. We also assume that local journalists were interested in the story, and that as a public institution UDC would invite some broader public interest in why it had fired one of its athletic coaches. But, having said this, we would risk greatly exaggerating the turmoil over Stockard's firing by characterizing it as a controversy over an "issue [that] was being debated publicly and ... had foreseeable and substantial ramifications for non-par-

---

35. While *Waldbaum* seems to require that the plaintiff voluntarily inject himself into the public debate, the District of Columbia Circuit has also recognized that a person can become an *involuntary* limited-purpose public figure when the plaintiff plays a central, if unintentional, role in a public controversy and becomes "well known to the public in this one very limited context." *Dameron v. Washington Magazine, Inc., supra,* 250 U.S.App.D.C. at 346, 779 F.2d at 741–42 (plaintiff, an air-traffic controller on duty during a fatal crash, became "embroiled, through no desire of his own, in the ensuing controversy over the causes of the accident").

*Dameron* may not be read broadly, however, for in *Gertz* the Supreme Court admonished that "the instances of truly involuntary public figures must be exceedingly rare." 418 U.S. at 345, 94 S.Ct. at 3009. Simply being the subject of discussion is not enough; "a private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter which attracts public attention." *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 168, 99 S.Ct. 2701, 2707, 61 L.Ed.2d 450 (1979); *Waldbaum, supra,* 201 U.S.App.D.C. at 312 n. 31, 627 F.2d at 1298 n. 31.

ticipants.... *Id.* at 311, 627 F.2d at 1297. Certainly it was nothing like the large-scale "public debate within the supermarket industry and beyond" at issue in *Waldbaum,* a debate that attracted frequent news reports and "would affect consumers and retailers in the Washington area and, perhaps, elsewhere." *Id.* at 313, 627 F.2d at 1299. Nor is it comparable to the controversy in *Dameron v. Washington Magazine, Inc., supra,* in which the plaintiff—a federal air-traffic controller—"was at the center of a controversy involving the loss of many lives in a mishap involving a public carrier," a dispute involving "an extensive, public investigation" and demanding many hours of public testimony by the plaintiff. 250 U.S.App.D.C. at 352, 779 F.2d at 742.

 We thus have considerable doubt whether Stockard's firing meets the standard of "public controversy" necessary to satisfy the first *Waldbaum* criterion. We need not resolve that issue finally, however, because it is apparent that the second requirement of *Waldbaum* is not fulfilled. Nothing in the record suggests that Stockard attempted to put her side of the story concerning her handling of funds before the public, or otherwise used the influence of her position to affect the outcome of the controversy over why she was fired. *See*

**36.** The University told the press that Stockard had been discharged because of her inadequate win and loss record.

**37.** We also find no merit in the related points that (1) because the women on the team regarded Stockard as a "mentor" and "surrogate mother," she was a limited-purpose public figure within the forum where the defamation was published, and (2) she invited potentially defamatory comment about her handling of public funds because she took a job that involved entrustment of such funds to her. The *New York Times* rule rests on the constitutional necessity of affording defendants who criticize public officials or public figures "breathing space" to secure society's interest in robust debate of controversies affecting the public well being. *New York Times, supra,* 376 U.S. at 271–72, 84 S.Ct. at 721. *See also Dun & Bradstreet v. Greenmoss, supra* note 23, 472 U.S. at 780, 105 S.Ct. at 2956 (Brennan, J., dissenting). The constitutional defamation cases strike a careful balance between this societal interest and the states' interest in affording a remedy for reputational inju-

*Hutchinson v. Proxmire, supra,* 443 U.S. at 135–36, 99 S.Ct. at 2688. In fact, Stockard deliberately avoided talking to both the players and the press about her discharge, and the university gave a pretextual reason for her firing to interested reporters.[36] *See Wolston, supra* note 35, 443 U.S. at 167–68, 99 S.Ct. at 2707 (person who never talked to the press and limited his involvement in issue to that necessary to defend himself against criminal contempt charge not a limited-purpose public figure, since he did not "engage[ ] the attention of the public in an attempt to influence the resolution of the issues involved"); *Waldbaum, supra,* 201 U.S.App.D.C. at 312, 627 F.2d at 1298 (person who rejects any role in debate does not "invite comment"). Nor is this one of those "exceedingly rare" instances as in *Dameron, see Gertz, supra* note 19, 418 U.S. at 345 [94 S.Ct. at 3009], where the plaintiff became an "involuntary public figure."

In light of our conclusion that Stockard did not undertake to influence the outcome of the public controversy, we are unpersuaded by appellants' contention that she became a limited-purpose public figure as regards her dispute with Moss and UDC solely because of her position within women's basketball circles.[37] The defect in this

ry. *Id.; Gertz, supra* note 19, 418 U.S. at 339–43, 94 S.Ct. at 3006–08. To hold a person a public figure for purposes of any dispute arising within a circle in which she has achieved some degree of prominence, or to expose anyone handling public funds to defamatory charges of misappropriation, would give the rule an inappropriately broad compass without reference to that balance of interests. *See Hutchinson, supra,* 443 U.S. at 135, 99 S.Ct. at 2688 (scientist who received federal funds for research did not become public figure for limited purpose of comment on his use of funds; otherwise "everyone who received or benefited from the myriad public grants for research could be classified as a public figure—a conclusion that our previous opinions have rejected"). Appellants appear to base their argument on an entirely inapposite footnote in *Waldbaum* which merely observed that, for a person to become a general purpose public figure, widespread fame and notoriety within the locality where the defamation is published may suffice, and nationwide fame is unnecessary. *See* 201 U.S.App.D.C. at 309–10 n. 22, 627 F.2d at 1295–96 n. 22.

reasoning is that there is no connection between Stockard's alleged prominence in these circles and the dispute in question. Stockard's position is markedly different from that of other sports figures who have become so prominent "they unavoidably enter the limelight," becoming general purpose public figures. *Waldbaum, supra,* 201 U.S.App.D.C. at 313–14 n. 36, 627 F.2d at 1299–1300 n. 36.[38] At the time of the publication, Stockard served as a part-time head coach of a fledging women's basketball team that, despite her efforts to increase its prominence, had achieved only limited success in capturing attention from the public and the organized collegiate athletic community. Paraphrasing *Gertz,* "[a]lthough [she] was consequently well known within some circles, [s]he had received no general fame or notoriety in the community." 418 U.S. at 351–52, 94 S.Ct. at 3013.

■ Moreover, the plaintiff in *Waldbaum* had used the power and influence of his position to assume a prominent role in shaping an ongoing debate in an area of public concern. Stockard, by contrast, did not attempt to exploit her authority or reputation as a women's basketball coach to influence the result of the controversy surrounding her firing. Merely by achieving some success as a basketball coach, she did not expose herself to a greater risk of being falsely accused of financial defalcation in her duties than any other person.

### 3. Conclusion

In summary, the perceived need by Moss and UDC to communicate to a limited audience within the university—the players and coaches—the reason for Stockard's discharge implicates no public interest of constitutional dimension. It therefore does not warrant subordinating society's interest in affording relief for reputational injury that results from defamatory falsehood. UDC's interests in communicating the reasons for Stockard's discharge[39] are indistinguishable from those of any other employer—public or private—and are amply protected by the qualified "common interest" privilege discussed above. We hold that Stockard was a private figure for purposes of comment concerning the money-handling incident, and was not obliged to demonstrate actual malice by clear and convincing evidence.[40]

---

**38.** *Cf., Butts, supra,* 388 U.S. at 154–55, 87 S.Ct. at 1991 (University of Georgia athletic director Wally Butts "commanded a substantial amount of independent public interest at the time of publication," and attained public figure status "by position alone"); *Tavoulareas, supra* note 22, 260 U.S.App.D.C. at 49, 817 F.2d at 772, citing *Chuy v. Philadelphia Eagles Football Club,* 431 F.Supp. 254, 267 (E.D.Pa.1977), *aff'd,* 595 F.2d 1265 (3d Cir.1979) (en banc) (professional football player enters profession which draws him regularly into regional and national view and leads to fame and notoriety in the community).

**39.** As mentioned previously, the University concealed the true reason for Stockard's discharge from the press, preferring to treat the affair as a purely private matter to be resolved within the university community.

**40.** In directing a verdict in appellants' favor on the punitive damages issue, the trial judge concluded, consistent with Standardized Civil Jury Instructions for the District of Columbia, No. 17–17, that Stockard could only recover punitive damages on a showing of "actual malice" by *clear and convincing evidence.* However, in denying the appellants' motion for a new trial—relying on *Ingber v. Ross, supra*—he concluded

that she could recover presumptive damages without proof of injury because Moss had acted with reckless disregard for falsity in failing to adequately investigate prior to speaking. The appellants note this inconsistency in connection with a somewhat indistinct argument that the jury was improperly instructed as to malice.

At common law, at least with regard to a limited group of statements defamatory *per se,* see RESTATEMENT (SECOND) OF TORTS, *supra,* § 570; *Afro–American Publishing Co., supra,* 125 U.S. App.D.C. at 81 n. 32, 366 F.2d at 660 n. 32, a plaintiff could recover without proof of pecuniary injury; "the existence of injury was presumed from the fact of publication." *Gertz, supra* note 19, 418 U.S. at 349, 94 S.Ct. at 3011. *See, e.g., Washington Times Co. v. Bonner,* 66 App.D.C. 280, 288, 86 F.2d 836, 844 (1936). The Court in *Gertz* abrogated this "oddity of tort law," holding that a state may not permit recovery of presumed damages unless liability was based on a showing of *New York Times* actual malice. 418 U.S. at 349–50, 94 S.Ct. at 3011–12. In *Dun & Bradstreet v. Greenmoss Builders, supra* note 23, the Court narrowed *Gertz,* holding that a private plaintiff may recover presumed damages without a showing of actual malice when the defamatory statement relates to a "matter of purely private concern." 472 U.S. at 759–60, 105 S.Ct. at 2945.

## IV. Breach of Contract

■ We agree with appellants that the judge erred in allowing Stockard to recover $9,000 in damages for breach of contract for the 1981–82 coaching season. The judge concluded that the jury reasonably could have found the defendants "were estopped from denying the existence of a contract for the 1981–82 season." Thus, the judge did not enforce Moss's promise to renew for that season as a formal contract, but rather on a theory of promissory estoppel. "[T]o hold a party liable under the doctrine of promissory estoppel 'there must be a promise which reasonably leads the promisee to rely on it to his detriment, with injustice otherwise not being avoidable.'" *Solway Decorating Co. v. Merando, Inc.*, 240 A.2d 361, 362 (D.C.1968) (citation omitted); *see Bender v. The Design Store Corp.*, 404 A.2d 194, 196 (D.C.1979). While we agree with the judge that the evidence was sufficient to permit a jury finding that Moss's April 28, 1980 and March 12, 1981 memos induced Stockard to rely on his assurance that her contract would be renewed for the following year, it cannot be said that injustice would have resulted from a failure to award her compensatory damages.

This is so because Stockard had already been fully compensated for any injury resulting from Moss's breach of promise to renew her contract for the 1981–82 season in a settlement of her Human Rights Act claims against Moss, UDC and the District. See note 10, *supra*. Paragraph 5 of the October 24, 1982 settlement agreement provides:

> Complainant shall receive back pay in the amount of $21,157.50, representing pay from April 1981 through September 1982, at $14,105 per annum (the current salary rate for the position), plus pay at the same rate from October 1, 1982, up to the effective date of the complainant's reinstatement, less any earnings from any other outside employment, which shall be processed in accordance with the procedures of the D.C. Payroll Office.

Contrary to Stockard's assertion that the amounts received to settle her claims were meant to compensate her for undifferenti-

---

As to presumed damages otherwise recoverable at common law, however, neither *Gertz* nor *Greenmoss* squarely held that actual malice must be proven by clear and convincing evidence for this purpose. *Gertz* itself held no more than "the States may not permit recovery of presumed or punitive damages, at least when liability is not based on *a showing* of knowledge of falsity or reckless disregard for the truth." 418 U.S. at 349, 94 S.Ct. at 3011 (emphasis added). In circumstances where *Gertz* and *Greenmoss* apply, the quantum of proof of actual malice necessary to sustain an award of presumed damages otherwise recoverable for statements defamatory *per se* appears to be an open question in this jurisdiction.

We need not resolve that issue here, however. First, the appellants have not raised it on this appeal. More importantly, the jury instructions and the resulting verdict were *not based upon a theory of presumed damages*. In fact, the judge specifically instructed the jury that:

> before the plaintiff may recover in this case, you must find that *she has proven by a preponderance of the evidence* that she was slandered by the defendant and that *she sustained actual injury as a result....* [I]f you determine that the plaintiff sustained actual injury ... then you should return a verdict of compensatory damages. In fixing the amount of the verdict, *you must be guided solely by the evidence before you.* [Emphasis added.]

The court correctly went on to identify the components of compensatory damages for defamation, compensation for: detraction from good name and reputation, *see Afro–American Publishing Co., supra*, 125 U.S.App.D.C. at 81, 366 F.2d at 660, for mental anguish, distress and humiliation, *see Vassiliades v. Garfinckel's*, 492 A.2d 580, 594 (D.C.1985); and for injuries to Stockard's occupation as a basketball coach. *See Washington Times Co. v. Bonner, supra*, 66 U.S.App.D.C. at 288–89, 86 F.2d at 844–45 (1936). These instructions did not suggest to the jury that they could presume "damage to reputation without any proof that such harm actually occurred," *Gertz, supra* note 19, 418 U.S. at 349, 94 S.Ct. at 3011, but rather that Stockard was required to prove actual injury and its extent.

Even though the trial court apparently overlooked the theory of damages upon which the jury was instructed in denying appellants' post-trial motions, this constitutes no reason to disturb the verdict, as we conclude that the remitted award was supported by competent evidence of actual injury. Although Stockard offered little evidence of monetary loss, actual reputational harm is not susceptible of ready quantification; it is therefore not "limited to out-of-pocket-loss" and "there need be no evidence which assigns a dollar value to the injury." *Id.* at 350, 94 S.Ct. at 3012.

ated damages, and not earmarked as remuneration for lost earnings, the sums set out in Paragraph 5 are expressly denominated "back pay" and relate to the same time period as the remitted jury verdict on her contract count.

In refusing to consider appellants' setoff claim based upon the payment of back salary, the judge relied on the final provision of the settlement agreement which stated: "This agreement shall in no way affect Civil Action No. 4362–82." Although this provision could have been included by the parties for multiple reasons, including—as appellants suggest—to prevent use of the settlement as evidence against UDC on liability, it is unnecessary to speculate as to the paragraph's intended effect. Regardless of the parties' intent, the denial of the setoff afforded Stockard a double recovery on her claim that Moss's breach of promise resulted in the loss of her salary for the 1981–82 season.

> [A] cardinal principle of law is that ... a plaintiff can recover no more than the loss actually suffered. For when the plaintiff has accepted satisfaction in full for the injury done him, from whatever source it may come, ... he is so far affected in equity and good conscience, that the law will not permit him to recover again for the same damages. The office of compensatory damages is to make the plaintiff whole, but certainly not more than whole.

*Kassman v. American Univ.*, 178 U.S.App. D.C. 263, 267, 546 F.2d 1029, 1033 (1976) (per curiam) (internal quotation marks and footnotes omitted); *see Reid v. District of Columbia*, 391 A.2d 776, 777 (D.C.1978). To allow compensatory damages for Moss's breach of promise would offend this "cardinal principle," particularly where the basis of recovery lies in the inherently equitable doctrine of promissory estoppel, which allows the court to enforce a promise absent a binding contract only when to do so would prevent an injustice. We therefore reverse that part of the judgment permit-

ting recovery of $9,000 in damages for the 1981–82 coaching season.

## V. The Remittitur

■ Lastly, we affirm the judge's remittitur of the jury verdict on the slander count. A jury verdict "must strike a balance between ensuring that important personal rights are not lightly disregarded, and avoiding extravagant awards that bear little or no relation to the actual injury involved." *Phillips v. District of Columbia*, 458 A.2d 722, 726 (D.C.1983). In this jurisdiction, a jury verdict is excessive when it "is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate," *Wingfield v. Peoples Drug Store*, 379 A.2d 685, 687 (D.C. 1978), *quoting Graling v. Reilly*, 214 F.Supp. 234, 285 (D.D.C.1963), or when it is "beyond all reason, or is so great as to shock the conscience." *Id.*, *quoting Williams v. Steuart Motor Co.*, 161 U.S. App.D.C. 155, 494 F.2d 1074 (1974). Excessiveness refers not merely to the amount of the verdict but to whether, in light of all the facts and circumstances, the verdict appears to have been the product of passion, prejudice, mistake or consideration of improper factors rather than a measured assessment of the degree of injury suffered by the plaintiff. *May Dep't Stores v. Devercelli*, 314 A.2d 767, 774–75 (D.C. 1973); *see also Vassiliades, supra* note 40, 492 A.2d at 594.

Determining whether a jury's verdict exceeds reasonable limits lies within the discretion of the trial court. *Lacy v. District of Columbia*, 408 A.2d 985, 988 (D.C.1979). If the verdict is excessive, the court may order a remittitur or, in the alternative, a new trial.[41] Although the "abuse of discretion" standard is deferential, *see, e.g., Safeway Stores v. Kelly*, 448 A.2d 856, 864 (D.C.1982), when reviewing the grant of a new trial or remittitur because of an excessive verdict, our role "is not merely to rubber-stamp the trial court's decision,"

---

**41.** To avoid violating the Seventh Amendment's general reservation of such issues for resolution by a jury, "the court usually must afford the prevailing party the option of rejecting the re-

duced award and obtaining a new trial on the issue of damages." *Phillips v. District of Columbia, supra*, 458 A.2d at 724. The court followed this procedure here.

*Lacy, supra*, 408 A.2d at 988, as the trial judge has necessarily assumed the jury's fact-finding role. Thus, our task is to determine "whether after close scrutiny there is firm support in the record for a finding by the trial judge that the verdict is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate, given the respect accorded the judge's unique opportunity to consider the evidence in the living court-room context." *Id.* at 988–89 (internal quotation marks and citations omitted).

The judge concluded that the $300,000 verdict exceeded the outer limits of reasonableness at least by a factor of three, so that the "jury must have been improperly motivated." In reaching this conclusion, the judge correctly identified the factors the jury properly could take into account in assessing compensatory damages, including: the seriousness of the defamatory charge, the extent of its distribution, the extent to which the communication was actually believed, and the plaintiff's prominence and professional standing in the community. *See Ingber, supra*, 479 A.2d at 1265. Our review of the record reveals that although the charge of misappropriation was indeed serious, it was disseminated among a small group of individuals within the university community. Indeed, Moss declined an opportunity to circulate the charge to the news media, which would have ensured widespread distribution and compounded the injury considerably, instead informing the press that Stockard's lack of success as a winning coach had caused the discharge. Moreover, the members of the team who heard the statement indicated that they did not believe it. Finally, although Will Jones, UDC's head basketball coach, testified that the events surrounding Stockard's firing had affected her reputation among basketball coaches, he noted that whenever a basketball coach is fired, it puts "a shadow over you because the profession is always questioned as to what really happened." While he repeatedly emphasized that Stockard's *discharge* adversely affected her reputation in the intercollegiate basketball community,

he did not testify that Stockard had been stigmatized for dishonesty by Moss's publication of the misappropriation charge.

On this record, and in light of the trial judge's superior ability to sense the atmosphere of the case, we cannot say that he abused his discretion in finding the verdict "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." We therefore affirm the remittitur of the slander verdict.

## VI.

For the foregoing reasons, the judgment is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*